BROTHERS *v*. DIERKS LUMBER & COAL COMPANY.

4-9245                                    232 S. W. 2d 646

Opinion delivered July 3, 1950.

Rehearing denied October 9, 1950.

*Bates, Poe & Bates,* for appellant.

*Watson, Ess, Whittaker, Marshall & Enggas, Abe Collins* and *Elbert Cook,* for appellee.

LEFLAR, J.   Appellants filed a Workmen's Compensation claim against appellee Direks Lumber & Coal

Co. (hereinafter called Dierks) and one Dan Durham on account of the death of their husband and father, Chester O. Brothers, who was killed when a log rolled off a truck onto him while he was helping unload logs being hauled from the Ouachita National Forest to a Dierks lumber mill. The Workmen's Compensation Commission denied the claim against Dierks, on the ground that decedent Brothers was not an employee of Dierks but was employed only by Durham, who was held to be an independent contractor. The claim was allowed against Durham only. It is shown that Durham is financially worthless, and without insurance, so that he cannot pay the claim allowed. He did not appeal. The dependents of the decedent appealed against Dierks, and the Circuit Court affirmed the order of the Workmen's Compensation Commission. This appeal is from the Circuit Court judgment.

Appellant relies upon two separate grounds for reversal, one ground involving primarily the facts and the other primarily a question of law. Under the fact heading, the contention is that Durham was not an independent contractor at all, but merely a supervisory employee of Dierks, hired to handle the job of hauling logs from the forest to the mill and to superintend the labors of other employees, like the decedent Brothers, who were hired to work on the same job. Considerable evidence was offered, though most of it was excluded, to the effect that Dierks' regular system was one of employing foremen under the guise of independent contractors so as to achieve certain advantages which were deemed to inhere in the absence of an employer-employee relationship between Dierks and the loggers. This evidence if admitted would apparently have been supported by evidence that a similarly disguised relationship was present in the instant case.

We find it unnecessary to pass upon this fact question, or upon the admissibility of the proffered evidence, because it appears that the other ground of appeal, primarily one of law, requires reversal in any event. This ground assumes that Durham was an independent contractor, as contended by Dierks. It has to do with the

interpretation of § 6 of the 1939 Workmen's Compensation Act (Ark. Stats., § 81-1306).

Section 6 provides that "a contractor in the performance of whose contract one or more persons are employed, . . . by a subcontractor, who subcontracts all or any part of such contract shall be liable for and shall pay compensation to any employee injured whose injury arises out of and in the course of such employment, unless the subcontractor primarily liable therefor has secured compensation for such employee as provided in this act." Under this section, if a subcontractor does not carry compensation insurance (or self-insurance) on his employees, they are deemed "statutory employees" of the main contractor for purposes of the Workmen's Compensation Act.

·Dan Durham did not have insurance of any kind on Brothers or the other men who were helping him haul logs for Dierks. The evidence disclosed that Dierks had maintained Compensation insurance for Durham and his crew, and apparently for other similar crews, until about a month before Chester Brothers was killed, but the carrier insurance company had then canceled the policy, apparently because the risk was so great. Durham testified that he thought he and the crew were still covered by insurance when Brothers was killed, but it is now clear that they were not.

The question is presented whether Dierks was a "contractor" and Durham a "subcontractor" within the meaning of § 6. Appellee Dierks' position is that it was merely a purchaser of timber, and not a "contractor" in the statutory sense.

Dierks was removing merchantable timber from the Ouachita National Forest under a contract with the Forest Service of the Department of Agriculture of the United States. The contract was quite lengthy, covering some fifteen typed, printed and mimeographed pages. The central feature of the contract was that Dierks became the purchaser of certain timber, of which the Forest Service was the seller. But the contract was much more than a mere bill of sale. It set out in great detail

the manner in which Dierks was to cut and remove the timber. An obvious objective of the contract, along with the sale of merchantable timber, was the doing of work by Dierks which would help to preserve and maintain the National Forest in accordance with good forestry practices.

The contract by its terms was unassignable by Dierks. The manner of cutting individual trees was specified, both as to height of stumps, the diameter at which tops were to be cut off, and what trees were to be cut. Refuse and debris were to be disposed of by Dierks so as not to pollute streams or develop unsanitary conditions in the forest, and "slash" was to be distributed in a designated and detailed manner. The maintenance of fires and activities likely to cause fire were regulated in minute detail, and Dierks was required to keep all its employees available to the Forest Service for fire-fighting duty at all times. The contract required that fifty percent of the laborers used in cutting and removing the timber be residents of Scott, Montgomery and Yell counties. The manner in which Dierks' work was to be done in reference to young timber left standing was set out. Telephone lines, ditches and fences were to be protected by Dierks, or repaired if they should be damaged. Dierks was required to clean up all loading spaces by piling and burning debris, as directed by the Forest Officer, whether the debris was produced by Dierks or by others. Roads built by Dierks in the Forest area, for hauling out timber, were to be constructed according to defined standards and specifications. Designated roads were to be repaired by Dierks. The manner of road maintenance and repair was specified, and the road maintenance obligation was imposed on Dierks regardless of whether the hauling be done "by the purchaser (Dierks) or by other persons or concerns as sub-contractors or customers of the purchaser." Numerous other clauses in the contract imposed still other duties on Dierks. The various conditions in the contract were inter-dependent, and the Forest Officer was authorized to suspend all operations under the contract, including the removal of scaled timber, in

event of non-compliance by Dierks with any of the terms of the contract.

This Court has had occasion once before to deal with a Forest Service timber sale contract like this, in *Cook, Commr. of Revenues,* v. *Wilson,* 208 Ark. 459, 187 S. W. 2d 7. The issue there was as to the collectibility of state severance taxes, a matter not relevant in the present case, but it is worthy of note that we then emphasized the detailed performances due under the contract, as distinguished from the purchase and sale feature merely. And on appeal to the United States Supreme Court (*Wilson* v. *Cook,* 327 U. S. 474, 66 S. Ct. 663, 90 L. Ed. 793) the problem was stated in terms of ''a contractor who had contracted with the United States for the purchase and severance of timber on national forest reserves,'' and Chief Justice STONE proceeded to discuss the transaction in terms of ''the contracts of severance and purchase'' and not merely in terms of a sale.

The only American case substantially similar to the instant case, that we have been able to discover, is *Nylund* v. *Thornberg,* 209 Minn. 79, 295 N. W. 411. The Minnesota court there held a purchaser of timber from the State to be liable for workmen's compensation to an employee of a subcontractor, under a statute like our § 6. The employee was injured while cutting and removing timber from State lands under direction of his subcontractor employer. The defendant purchaser's contract with the State for severance, removal and purchase of timber was quite similar to Dierks' contract with the Forest Service, the terms of a relevant Minnesota statute having been incorporated into the contract. The Minnesota court, speaking of the statutory contract, said:

''. . . the status of the holder of a permit issued thereunder is much that of a general contractor in cutting and removing the merchantable timber from the state's land. True, it speaks of the sale of the timber, but such sale results from a compliance with the numerous terms and conditions prescribed by the statutes mentioned. (The Court then reviewed some of these terms and conditions, several of which were almost identical

with those in the Dierks contract.)  It is apparent that the state has a vital interest in having the timber properly cut and removed without harm to growing trees on the land not included in the permit and to have the tops, branches or slashings properly burned, thus protecting its lands and its inhabitants against forest fires.  Taking the whole situation in view, we think the holder of a valid timber permit  .  .  .  is a general contractor of the state in cutting and removing the timber, and the one to whom he lets the actual work becomes his subcontractor, within the meaning of Mason's Minn. St. 1940 Supp. § 4290, subd. 4 (equivalent to § 6 of the Arkansas Workmen's Compensation Act.)  Hence relator becomes liable for compensation to respondent accidentally injured, because (the subcontractor) failed to carry compensation insurance.''

Arkansas has in earlier cases held that § 6 of the Workmen's Compensation Act applied to employees of a subcontractor where the main contractor's obligations under a contract for purchase and sale of timber products were considerably fewer than under the Dierks-Forest Service contract. *Hobbs-Western Co.* v. *Craig,* 209 Ark. 630, 192 S. W. 2d 116; *Hobbs-Western Co.* v. *Morris,* 212 Ark. 105, 204 S. W. 2d 889.  Though both these cases involved the point, the first was the one that actually interpreted § 6.

In *Hobbs-Western Co.* v. *Craig,* the decedent Craig was employed by one Lea, held to be a subcontractor under Hobbs-Western Co. within the meaning of § 6.  The principal contract, comparable to the Dierks-Forest Service contract in the present case, was between Hobbs-Western Co. and the Rock Island Railroad.  This principal contract provided that Hobbs-Western Co. should sell and the Rock Island Railroad should buy from Hobbs-Western Co. all the railroad ties the Railroad should require for a given five-year period.  The contract set the price for the ties, and specified their dimensions, but it did not call for them to be cut from any particular lands, nor by any particular persons, nor in any particular detailed manner.  This Court held that the contract be-

tween Hobbs-Western Co. and the Rock Island Railroad made Hobbs-Western Co. a "contractor" within the meaning of § 6, and that Lea was a "subcontractor" under the section since he was cutting ties under contract with Hobbs-Western Co. to enable it to supply the requirements of the principal contract with the Rock Island Railroad. Because the "subcontractor" Lea was uninsured, recovery was allowed on Craig's behalf against the "contractor" Hobbs-Western Co.

Both the Dierks-Forest Service contract and the Hobbs-Western-Rock Island contract were primarily purchase and sale contracts. The only factual difference between them, in terms of § 6, is that Dierks was the buyer under its contract whereas Hobbs-Western Co. was the seller. This is an irrelevant difference as far as § 6 is concerned. As a difference, it does not bear upon the question whether the parties to the contracts were "contractors."

If Hobbs-Western Co. was a "contractor" within the meaning of § 6 (and we have so held)[1] there is no escape from the conclusion that Dierks was likewise a "contractor" under the same section. The contractual duties imposed upon Dierks under its contract, by way of work to be done and services to be performed as distinguished from the mere sale of goods, were far more substantial than those imposed upon Hobbs-Western Co. under its contract. We do not hold that a mere contract for the sale of goods makes either the buyer or seller, or both, a "contractor" within the meaning of § 6, but we are committed to the view that when the contract to sell is accompanied by an undertaking by either party to render substantial services in connection with the goods sold, that party is a "contractor" within the meaning of the section.

---

[1] In order to make certain that this issue was clearly presented to the Court, we have re-examined the briefs and the transcript, including the principal contract between the Rock Island Railroad and Hobbs-Western Co., filed in the case of *Hobbs-Western Co.* v. *Craig*, 209 Ark. 630, 192 S. W. 2d 116, and we find that the question whether Hobbs-Western Co. was a "contractor" within the meaning of § 6 was argued as a principal issue in the case. Re-examination of the briefs and transcripts filed in *Hobbs-Western Co.* v. *Morris*, 212 Ark. 105, 204 S. W. 2d 889, shows that the issue was again presented there.

Once it is determined that Dierks was a "contractor" under its Forest Service contract, it follows auto-matically that Dan Durham was a "subcontractor," since he was performing under contract with Dierks a part of the work—removal of the merchantable timber—called for by the Dierks-Forest Service contract. The fact that Durham was not cutting timber, but only removing it, is unimportant; a single subcontractor is not expected to do all the work which the principal contractor has agreed to do. What Durham was doing was an essential part of the interdependent whole called for by the Dierks-Forest Service contract. And Durham was uninsured.

One further argument is urged by appellee Dierks. This is that § 6 of the Arkansas Workmen's Compensation Act is unconstitutional, regardless of what interpretation we give it.

This argument is based upon the wording of Amendment 26, the Workmen's Compensation Amendment to the Arkansas Constitution. Prior to the adoption of Amendment 26 in 1938, the old Art. V, § 32 of our Constitution provided that "No act of the General Assembly shall limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property." This prevented the enactment of a general workmen's compensation law because such a law would put a limit on the pre-existent common law liabilities of employers to their employees for personal injuries. To cure this, amendment 26 was worded as follows:

"The General Assembly shall have power to enact laws prescribing the amount of compensation to be paid by employers for injuries to or death of employees, and to whom said payment shall be made. It shall have power to provide the means, methods, and forum for adjudicating claims arising under said laws, and for securing payment of same. Provided, that otherwise no law shall be enacted limiting the amount to be recovered for injuries resulting in death or for injuries to persons or property; and in case of death from such injuries the right of action shall survive, and the General

Assembly shall prescribe for whose benefit such action shall be prosecuted.''

Appellee's argument is that the exception to the old law, achieved by Amendment 26, is limited to ''the amount of compensation to be paid by employers for injuries to or death of (their own) employees,'' and that all other cases fall within the retained proviso, ''that otherwise no law shall be enacted limiting the amount to be recovered for injuries resulting in death or for injuries to persons or property.''

For one thing, we deem it safe to say that the framers of Amendment 26 had in mind the workmen's compensation laws of a majority of the other states, already in force in 1938. Most of these laws included the concept of the statutory employee, as it now appears in Arkansas in our § 6, as a part of their provisions for ''compensation to be paid by employers for injuries to or death of employees.'' See 2 Schneider, Workmen's Compensation (perm. Ed., 1942) 175; Annots., 58 A. L. R. 872, 105 A. L. R. 580. The framers of Amendment 26 intended to make it possible for Arkansas to enact workmen's compensation laws similar to those which had appealed to the good legislative judgment of other states. It cannot be assumed that they did not intend to adopt here the same concepts of the words ''employer'' and ''employee'' as were already in force in the same field in other states.

Our decisions in *Hobbs-Western Co.* v. *Craig,* 209 Ark. 630, 192 S. W. 2d 116, and *Hobbs-Western Co.* v. *Morris,* 212 Ark. 105, 204 S. W. 2d 889, already discussed herein, did not it is true pass expressly upon the constitutionality of § 6, but they did take its constitutionality for granted, and enforced the section on the assumption that it was constitutional.

The only relevant limitation which Amendment 26 imposes upon free legislative action is that ''no law shall be enacted limiting the amount to be recovered for injuries resulting in death or for injuries to persons or property.'' It does not deny the legislature's right to create

new causes of action for injury or death where none before existed. Before there can be a law *limiting* recoveries for injury or death, there would have to be some existent right to recover for such wrongs. Prior to the enactment of § 6, the employees of independent contractors save in extraordinary situations had no rights against the main contractor. The claimants in the present case would apart from § 6 have had no rights against Dierks, and § 6 in giving them a right against Dierks therefore did not limit any amount otherwise recoverable by them. § 6 merely gave them a right; it did not take any right away from them. Our conclusion is that § 6 is a constitutional enactment under the authority conferred by Amendment 26.

The judgment of the Circuit Court is reversed, with instructions to remand the cause to the Commission for the entry of an award in accordance herewith.