No. 42,726

ERNEST LACKEY, *Appellee*, v. JESSE PRICE, JR., and BOB BOLTZ, *Appellants.*

(378 P. 2d 19)

Opinion filed January 26, 1963.

D. Stewart Oswalt, of Hutchinson, argued the cause, and Abraham Weinlood, Bill R. Cole and John H. Shaffer, all of Hutchinson, were with him on the brief for the appellants.

Richard L. Ankerholtz, of Lyons, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

PRICE, J.: This was an action against defendants, Price and Boltz, for personal injuries sustained by plaintiff, Lackey, when a truck carrying liquified petroleum (LP) gas was involved in an explosion. The explosion occurred at a time when the truck was being washed by Boltz—an employee of Price—inside the service station owned and operated by Price.

The action was brought and tried under the theory of *res ipsa loquitur*. Judgment was for plaintiff, and defendants have appealed.

The theory of the case, as pleaded in the petition, was that at all times material the defendants were in sole and exclusive possession, management and control of the service station and of the truck involved in the explosion; that the explosion and resulting injuries to plaintiff was an occurrence which would not have taken place except for some act or acts of negligence of defendants in the handling and servicing of the truck, and that such acts of negligence, being unknown to plaintiff, were the direct and proximate cause of plaintiff's injuries.

Defendants' demurrer to the petition was overruled.

The answer admitted that the gaseous vapors escaped from the truck in question, denied negligence on the part of defendants,

and alleged that plaintiff was guilty of assumption of risk and contributory negligence in entering the service station at the time he did; and further alleged that plaintiff's injuries were proximately caused by the negligence of the owner of the truck and his employees in delivering the truck to the service station in a defective condition in that valves on the hoses were not closed, and without first emptying or bleeding the hoses. It was further alleged the owner of the truck had failed to comply with rules and regulations of the office of state fire marshal relating to equipment for the handling of liquified petroleum gases.

At a pre-trial conference it was determined that plaintiff was relying on the theory of *res ipsa loquitur,* and that defendants relied upon the defense of assumption of risk, contributory negligence, and the negligence of third persons.

The following is a summary of plaintiff's testimony.

Plaintiff, a resident of Sterling, was an employee of one Johnson, the owner of the Sterling Butane Company. He was a truck driver and delivered LP gas to farmers in the area. He had been so employed for over three years. At about five o'clock in the afternoon on the date in question, December 1, 1958, he left his place of employment and went behind the Price Service Station, where he had parked his truck. Apparently the rear door of the service station was open, and Boltz asked him how to shut off the valve on the truck which was in the station. Plaintiff then looked inside the door and saw gas vapors on the floor under the truck. He recognized it as being LP gas and stated it looked like a heavy fog and was probably a foot high on the floor. He inquired of Boltz if all fires in the building were out. Boltz told him they were. Price then told him that he had checked the valves at the rear of the truck. Plaintiff then inquired if all doors and windows in the service station were open. Price and Boltz told him that they were open and asked him what remaining valves there were which should be closed. He told them there was one in the box, and he then went in the building and closed a valve on a hose which was in a box on the side of the truck. Just after he closed the valve he saw a flash, shut his eyes, and then went outside. He did not know the cause of the explosion. On the basis of his past experience with LP gas he knew that it was dangerous, but, nevertheless, he entered the building to shut off the valve with the idea in mind of helping the other persons in the building. He further testified as to the

box on the side of the truck where the valve or valves were located— that the function the valve serves is to cut off gas from the main valve to the hose, and that with the valve open gas would be in the hose.

A summary of plaintiff's testimony on cross-examination follows:

The gas in question had explosive characteristics and a flame or spark would ignite it. Ordinary heat without live flame or spark would not ignite it. Trucks belonging to his employer had been washed at the Price Service Station before. The first thing he saw when he looked in the rear door of the service station was the cloud of fumes or gas on the floor. He had driven the truck in the past. It was a 1958 truck which had two 600-gallon tanks mounted on it. The tanks were not new and had been transferred from an old truck. He immediately recognized the situation as being dangerous, but, nevertheless, entered the building and went directly to the box or cabinet on the side of the truck and closed the valve. After describing the two hoses rolled up in the cabinet on the side of the truck and details involved in bleeding hoses, he stated the hose should have been bled before the truck was driven into the building, the reason being that hoses sometimes burst. The fact that valves were open would mean that the hoses had not been bled.

Dwayne Miller testified for plaintiff, and a summary of his testimony follows:

He, like plaintiff, also was a truck driver for the Sterling Butane Company, and had been so employed for about six years. His duties were to deliver LP gas to customers and to fill tanks and tractors in the area. At noon on the day in question he had a conversation with one Moore, an employee of the Price Service Station, about getting the truck washed and greased. He took the truck to the service station at approximately 3:30 or 4:00 o'clock that afternoon. The truck was relatively new, but the tanks attached to it were approximately six years old. He was responsible for the maintenance of the truck and believed that it was in proper working condition. The tanks were approximately half full when the truck was brought to the station for servicing. Upon being asked what valves were closed when he left the truck at the service station he replied, "I couldn't swear that any were closed, sir." The hoses on the truck were approximately one year old, and when he left the truck at the service station he did not detect the odor of gas.

Upon cross-examination he testified that he had not bled the

hoses before taking the truck in for servicing and, not having been bled, the hoses would have been full of gas at the time. So far as he knew the tanks were in good condition and had no leaks. It was possible that the gas which escaped came from a bursting hose, and he was the one who was responsible for the hoses. There would be less likelihood of a hose bursting if it were bled. Although not denying that he made the statement, he did not recall telling an agent of the state fire marshal's office that the explosion and fire were caused by a failure to bleed the hoses. He admitted that his present feeling was that under like circumstances he would never again fail to bleed hoses.

On redirect examination he was asked if he had closed either of the valves and his answer was, "no."

Mr. Johnson, the owner of the Sterling Butane Company, and who owned the truck and who was the employer of plaintiff and Miller, also testified for plaintiff. He said that Miller was in charge of the truck and that the hose on the truck was approximately one year old, and that the purpose of bleeding hoses was to reduce pressure. If a leak developed in the hose on a tank like the one in question it could have been caused by a number of things, such as (1) the condition of the hose being such that at the time the pressure inside was greater than what was holding the hose together; (2) the addition of heat applied to the hose or to the tank, creating a greater outside temperature and thus causing the fuel to expand; (3) slamming the door on the hose, thereby causing an incision or rupture in the line, or (4) pulling the hose off the end of the fill knob, releasing gas.

The foregoing is a summary of the evidence introduced in behalf of plaintiff, and at the conclusion of its introduction defendants filed a demurrer as follows:

"Come now the defendants and demur to the evidence of the plaintiff for the reason that the facts and evidence on behalf of plaintiff fail to contain anything which would establish a cause of action against either of the defendants. Defendants affirmatively show that the plaintiff is barred by the doctrine of the assumption of risk, and affirmatively shows that he was guilty of contributory negligence, and if the plaintiff continues to contend that the doctrine of res ipsa loquitur is available to him, that no proper showing has been made and that therefore the evidence is insufficient to submit on the question of the defendants' negligence."

This demurrer was overruled—whereupon defendants introduced their evidence.

A summary of the testimony of defendant Price is as follows:

He had operated the service station for about one year prior to the date of the explosion. The station was engaged in the usual operations, such as washing, greasing and servicing of automobiles and trucks, and selling gasoline and automobile accessories. He had two employees—his codefendant, Boltz, and Moore. Prior to the date in question trucks owned by the Sterling Butane Company had been washed and greased at his station. On the day of the explosion he had been in Hutchinson, and upon returning to his station he noticed that the truck in question was being washed by Boltz. Miller, the truck driver for Sterling Butane Company, and who had driven the truck to the station for a wash job, was at the station at the time of his (Price's) return from Hutchinson. Miller asked Price to drive him home—which Price did. When Price returned Boltz called to him to come to the rear of the station to see what was the matter. He went to the back part of the station and found that something was leaking. He immediately went to the rear of the truck and shut off two main valves on the back end of the truck. Those valves controlled the liquid going to the filler hose. He also observed gas coming out of the truck underneath the panel which held the hose in the cabinet. This cabinet or box was on the right side of the truck near the front of the tanks. The cabinet had two doors on it. When trucks such as the one in question were brought to the station for servicing all he or his employees did was to wash and grease them. He was a former truck driver himself and had driven trucks similar to the one in question.

When Price, in response to the call from Boltz, went back to the truck he observed that the gas was spread out in vapor form probably six or eight feet around the truck. He saw liquid dropping from the bottom of the cabinet or box. Plaintiff then came in the door at the rear of the station and opened the cabinet door and turned the gate valve. Price further observed gas coming out of the hose, and that the hose in the cabinet was frazzled, thus indicating to him that it was a bad hose. After turning off the valve or valves in the cabinet plaintiff went toward the open door and just then the flash and explosion occurred. At the time in question the overhead gas units used in heating the station were off and there were no fires of any nature going in the station. There was a gas heater in the women's rest room which had to be turned off or on from the outside, but there was a wall between the rest room and the inside of the station and there were no openings in the wall. An

air compressor and a steam cleaner were in the station but both were off at the time, and, to his (Price's) knowledge, there was nothing in the station that might have caused the escaped gas to ignite.

On cross-examination Price testified that at the time in question the front and back doors of the station were open, and that as plaintiff opened the cabinet he, Price, saw loose ends sticking out from the hose, and that the hose was frayed and curled, and that gas was coming out of the cabinet with some pressure—supposedly from the hose. The truck had been in the station for at least half an hour prior to the explosion, and that all fires were turned out—further, that a spark of any kind could set it off.

A summary of the testimony of defendant Boltz is as follows:

He was an employee of Price and had worked at the service station for about eleven months prior to the date of the explosion. His duties were general and included washing and greasing automobiles and trucks, repairing tires, and the like. On the afternoon in question Miller left the truck at the station for a wash job. He, Boltz, drove it into the station from where it had been parked. He started to wash the truck and after he had washed the tanks a leak started near the right compartment of the truck. It made a hissing noise and sounded like the pop-off on an air hose. The noise came from the compartment (cabinet or box), and what appeared to be steam vapor came out through the cracks of the cabinet doors and dripped from the bottom. He called Price, who shut off or turned something in the back of the truck. Boltz also turned off the gas heater at that time and opened the door to the east side of the station. He saw plaintiff in the alley. He did not remember his conversation with plaintiff—however, plaintiff came in, opened the cabinet doors, and turned something. As the cabinet doors were opened he (Boltz) could see vapor coming out and also the vapor on the floor under the truck. The area covered by the vapor was eight to twelve feet across and eight to twelve inches deep on the floor. It had taken him about half an hour to wash the two tanks and they were washed with soap and cold water. It was a rather mild day and the outside temperature was about fifty to fifty-five degrees. He was unfamiliar with LP gas trucks, but had no reason to believe a leak was present when he drove the truck into the station. While not being familiar with the properties of LP gas, his custom had been to turn down the thermostat in the station when this type of truck was being serviced. Just after plaintiff made the adjustment or turned off a valve the explosion occurred.

Moore, the other employee of Price, testified that he had worked at the service station for six or seven months prior to the date in question. His duties were the general ones of a service station attendant. Earlier in the day he had had a conversation with Miller about washing and greasing the truck, and that it was brought to the station in the late afternoon. He had observed Boltz washing the truck, and his attention was next directed to it when he heard a hissing sound like an air hose. He observed a liquid vapor coming out of the cabinet near the front end on the right side of the truck. He heard Boltz call to Price. He did not know where the fire might have started from, but there was an explosion shortly thereafter. Although there was no opening from the ladies' rest room to the inside of the station where the explosion occurred, he had reached for the key to that room immediately prior to the explosion. It was warm in the building, and although they usually turned down the thermostat when the doors were opened, he had not seen Boltz turn it down before bringing the truck in.

Mr. Hickman, a deputy state fire marshal, also testified for defendants. He was familiar with flammable liquids, including LP gas. He had been so employed about four years and had made an inspection and investigation of the fire and explosion in question. He had interviewed Miller, and Miller had told him that the only valve that was closed was the self-pack valve, which is located at the end of the liquid hose. Miller also had told him that the explosion or fire was caused by the fill hose bursting within the metal compartment (cabinet or box), which was located on the right side of the truck. This witness also had interviewed plaintiff and plaintiff had told him that he was in the alley behind the service station, and that Boltz had called for him to come in and do something; that he, plaintiff, ran in and saw the gas spewing out of the bottom of the hose compartment, following which he reached inside and turned off the valve to the fill hose. The witness had checked the equipment of the Sterling Butane Company about sixty days before the explosion and had made no written order to correct any hazard found on the truck. Although there was no state regulation requiring that hoses be bled, he recommends that it be done and that the valve be closed, particularly after making deliveries and before returning to a congested area.

Plaintiff offered no evidence in rebuttal—and defendants moved for a directed verdict on the same grounds as were lodged in con-

nection with their demurrer to plaintiff's evidence. The motion for a directed verdict was overruled.

The case was submitted to a jury, which returned a general verdict for plaintiff against defendants in the amount of $4,500.

Defendants' motion for a new trial was overruled and judgment was entered on the verdict.

Defendants have appealed from the orders overruling (1) the demurrer to the petition, (2) the demurrer to plaintiff's evidence, (3) the motion for a directed verdict, (4) the motion for a new trial, and (5) from the final judgment of the court.

In their specifications of error defendants specify fourteen alleged errors. We note, however, that the order overruling their motion for a new trial is not included among them. That being the case, alleged errors relating to matters occurring at the trial for which a new trial was asked—such as instructions given and requested instructions refused, rulings on the admissibility of evidence, the denial of the motion for a mistrial, and the refusal to submit separate verdicts for each defendant—are not subject to review and cannot be considered on appeal. (*State, ex rel., v. Miller,* 177 Kan. 324, 279 P. 2d 223, 52 A. L. R. 2d 691; *Green v. State Highway Commission,* 184 Kan. 525, 337 P. 2d 657 [opinion on motion for rehearing at 185 Kan. 36, 340 P. 2d 927].) Application of the rule—to which we adhere—does not, however, preclude appellate review of the orders overruling the demurrer to the petition, the demurrer to plaintiff's evidence, and the motion for a directed verdict—all of which were appealed from and are specified as error.

Although the briefs somewhat commingle various arguments concerning *res ipsa loquitur,* assumption of risk, the "rescue" doctrine, contributory negligence, and the question of actionable negligence on the part of defendants—it is clear that the real contention in this case concerns the application of the doctrine of *res ipsa loquitur* to the facts and situation presented—and we proceed on that premise.

There is no occasion here to enter into a detailed discussion of the doctrine of *res ipsa loquitur.* Rules concerning its application have been stated many times, and we mention but a few of our recent cases—*Travelers Ins. Co. v. Hulme,* 168 Kan. 483, 213 P. 2d 645, 16 A. L. R. 2d 793; *Lamb v. Hartford Accident & Indemnity Co.,* 180 Kan. 157, 300 P. 2d 387; *Worden v. Union Gas System,* 182 Kan. 686, 324 P. 2d 501; and *Wehkamp v. City of Garden City,*

187 Kan. 310, 356 P. 2d 826, and the numerous decisions cited in those opinions.

The doctrine is a rule of evidence—and not of subtantive law—and does not create an exception to the rule that negligence is never presumed but must be established by proof. Generally speaking, the doctrine has application to a situation where the exclusive management and control of the thing which produced the injury is vested in the defendant, and the surrounding circumstances are such as to give rise to the inference that in the ordinary course of events the resulting injury would *not* have occurred *except* for the negligence of defendant—evidence of which the injured party is unable to produce, and the facts of which are peculiarly within the knowledge of defendant.

Examining the petition in this case—and giving it the liberal construction and favorable inferences to which, on demurrer, it is entitled—we are of the opinion that it sufficiently alleged a cause of action under the theory of *res ipsa loquitur* to withstand the demurrer.

In reviewing an order overruling a demurrer to the evidence or an order overruling a motion for a directed verdict—the rule is substantially the same. We are required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the demurrer—or motion—must be overruled and the matter submitted to the jury. ( *Albin v. Munsell,* 189 Kan. 304, 307, 369 P. 2d 323, and *Casement v. Gearhart,* 189 Kan. 442, 445, 370 P. 2d 95.)

All of the evidence in this case has been summarized in detail—and there is no occasion to repeat. A majority of this court is of the opinion that plaintiff's evidence was sufficient to make out a case under the theory of *res ipsa loquitur,* and therefore the demurrer thereto was correctly overruled. Likewise, a majority of this court is of the opinion that following the introduction of all of the evidence, it, the evidence, was such that reasonable minds could reach different conclusions thereon on the questions of negligence, proximate cause, and all other questions involved—and therefore the motion for a directed verdict was correctly overruled and the case was properly submitted to the jury. The verdict was approved by the trial court, and, no error being made to appear concerning any matter which is subject to review—the judgment is affirmed.

PARKER, C. J., and PRICE and SCHROEDER, JJ., dissent from subdivisions 2 and 3 of paragraph 4 of the syllabus and corresponding portions of the opinion.