No. 44,829

Fred D. Bendure, *Appellant*, v. Great Lakes Pipe Line Company, Inc., *Appellee*.

(433 P. 2d 558)

Opinion filed November 13, 1967.

*John E. Shamberg*, of Kansas City, argued the cause, and *Joseph Cohen*,

*Charles S. Schnider, Edward G. Collister, Jr., Gerald T. Elliott,* all of Kansas City, and *Joseph P. Jenkins,* of Chicago, Illinois, were with him on the briefs for the appellant.

*J. D. Lysaught,* of Kansas City, argued the cause, and *Lee E. Weeks, Leonard O. Thomas, Richard Millsap, Robert H. Bingham, Ervin G. Johnston, Miles D. Mustain* and *Roger D. Stanton,* all of Kansas City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HATCHER, C.: This was a personal injury action brought by an employee under K. S. A. 44-504, and which was defended under a claim that the Workmen's Compensation Act provided the exclusive remedy.

Certain introductory facts which are not in dispute will first be stated.

The defendant, The Great Lakes Pipe Line Company, was engaged in installing de-aerators and pumps in connection with its existing facilities at its Kansas City terminal. The work was being done by the defendant's own employees and was well within its authorized trade or business.

The plaintiff, Fred D. Bendure, was employed by the Builders Steel Company and came on the premises of the defendant to deliver two steel I-beams. The beams were 36 feet in length and weighed 612 pounds each. The beams were loaded on a flat bed truck with places on each side and at the rear end to insert stakes to keep the load from rolling off. The front end of the truck had a cowling running along the front end which flanged around the front sides about six or eight inches. The I-beams were touching the cowling in front and were lying parallel with the truck near the center of the bed.

As this entire controversy revolves around the unloading of the truck and the evidence from which the facts must be derived is conflicting, and in some instances inconclusive and subject to inferences, the testimony on this part of the controversy will be presented in detail.

The plaintiff testified that when he made the delivery to the defendant as far as he knew he was not to unload it. A very few times he had given help as a matter of courtesy. He did not know whether the price of the steel included unloading. When he arrived at the defendant's terminal he stopped at the main office for directions as to where they wanted him to unload it. He was directed to an open space south of the plant. He was met by Mr.

Ploth, terminal superintendent, who informed him they would not use an A frame but would roll the I-beams off. Plaintiff told Ploth that if they were going to roll the beams off they would have to pry the beams back from the front of the truck so they would not catch the cowling and tear it off. There was some conversation with Mr. Ploth about taking the stakes out.

". . . When he started pulling out the stakes, he started throwing them over the beams. It was so much handier to put them back under the beams, so I made mention of that fact so he laid them back on the bed, and shoved them under the beams. I told him we would leave the two back ones. The two in the back were left on. They were left as a safety precaution. If these two stakes were left in that position, I knew that the beams couldn't be taken off."

Plaintiff got a crow bar, got on the truck and started prying the beams back from the front to clear the cowling. Mr. Ploth directed a Mr. Copp to get a bar and help him. The plaintiff was at the front of the truck astride the I-beams prying when one of the beams fell off the rear side. He stated:

"My right leg was caught between the cowling and the beam. One beam moved only. I looked back because I couldn't imagine any way possible for the beam to be on the ground. I saw no stakes and the beam on the ground. I saw two or three men. They were at the back of the truck. The stakes weren't there. When I went astraddle of those beams, I did not expect anyone to remove those stakes from the rear. . . .

"At no time did Mr. Ploth give me any orders out there except parking the truck. I was not under orders from my company to take orders from the Great Lakes Plant Superintendent. I had never seen him before. . . .

"I have testified that near the middle of this truck this beam was 2½ feet from the edge. The west end of the beam was up against the cowling. The end of the beam on the cross bar to the east was three feet or more from the north edge of the truck. In order for the beam to have moved clear off and to come off, it had to travel at least three feet on the far cross member. I had no notice that there was anything wrong. The first notice I had was when it had me pinned to the cowl. The beam had me nailed to the cowl.

"I did not ask for Mr. Copp to assist me. I heard nobody ask for Mr. Copp. I didn't know who Mr. Copp was. I have never had a beam ever come off of my truck as in this case.

"Q. After you had pulled and pried the beam back from the cowling, what was your intention; what did you intend to do, after you got it pried back from the cowling?

"A. Just stay right there until it was unloaded.

"It was the idea of the Great Lakes' superintendent to roll it off the truck."

Mr. Arthur James Danforth, shipping clerk for Builders Steel Company, testified:

"Q. Now, do you, as a shipping clerk, have any control over the practices that are used in shipping, Mr. Danforth—in delivery—I'm sorry—the loading and unloading techniques that are used?

"A. Well, only insofar as we request the cooperation of our drivers, not putting themselves necessarily in someone else's employ or anything, but who cooperate basically to the extent of trying to get our trucks back serviceable and on the road again for us."

Mr. Merlin Hargrove, plant superintendent for Builders Steel Company, testified that the responsibility for unloading I-beams or steel products had never been discussed with the defendant. They ask their drivers to cooperate with their customers in such a manner the material would be unloaded to their satisfaction. The driver is subject to the customer's request for certain procedures such as to which door, at what point on the dock or at what part of the building the material would be unloaded. If an I-beam were up against hood or cowling of one of these big trucks, it should be pried back and rolled to the edge, if room, before the stakes are removed. He stated:

"It is our practice and suggestion in this kind of case involving these heavy beams that hoisting devices be used if they are available. Definitely. That is a safer way of doing it. It's not only safer to the individuals who are working in the area, but safer to our driver and the equipment. It is not unusual for the driver to ask and suggest to our customers that they use such a device if it is available."

The following is an interrogatory to appellee and answer:

"Did any employee of defendant start to unload two I-beams delivered by plaintiff to defendant's premises at 401 East Donovan Road, Kansas City, Kansas, on September 24, 1963, before plaintiff's injury?

"ANSWER: I. R. Ploth removed two stakes from the side of the truck involved before being told to stop by Fred D. Bendure, the plaintiff."

Mr. William T. Bruce, president of Builders Steel Company, testified:

"Q. Does your price structure include unloading?

"A. Yes and no; our price structure includes delivery to the job.

"Q. All right; does your customary procedure require that a man like Fred Bendure place him under the control and direction of a man like Mr. Ploth, who happens to be the terminal superintendent—

.    .    .    .    .    .    .    .    .    .    .    .

"A. Fred Bendure is one of our employees, and is under our jurisdiction, as far as I am concerned.

".    .    . It is one of Fred Bendure's duties as my employee to protect our equipment. We would expect him to take care of it and to see that no damage

is done to it. He has generally complied with that request. It isn't part of the important duties on his part to protect the equipment. We wouldn't expect him to abuse any of our equipment."

Mr. Irvin R. Ploth, superintendent of the Great Lakes Pipe Line terminal, testified that the plaintiff made no inquiry as to how Ploth was going to unload. About all he told the plaintiff was where to bring the truck and how they were going to unload. He knows of no written agreement between the two companies as to unloading. The plaintiff did not stop him from taking the stakes out.

Plaintiff brought this common-law action for his personal injuries. No issue is raised as to the pleadings. The case was tried to a jury and at the close of all the evidence the trial court sustained a motion for a directed verdict. The court stated reasons for its conclusion in part as follows:

". . . The motion for directed verdict is hereby sustained on this basis, the Court having found from the evidence specifically that all the requirements set forth in K. S. A. 44-503, A, B, and D have been met; . . .

"The combination of these factors is conclusive proof to the Court that at the time and place and circumstances surrounding the injury, the plaintiff was a special and statutory employee of the Great Lakes Pipe Line Company, and that the injury sustained in such unloading process meets all the tests previously announced by our Supreme Court in determining what constitutes a special employee."

The plaintiff has appealed.

The appellant contends that, at most, the evidence is conflicting as to the facts which constitute a special or statutory employee and the determination was therefore one for the jury.

The appellee contends that (1) "The work being performed by the independent contractor and the injured employee was necessarily inherent in and an integral part of appellee's trade or business." and (2) "The work being performed by the independent contractor and the injured employee was such as would ordinarily have been done by the employees of the appellee." either of which would create the relationship of special or statutory employer and employee bringing the employee under the Workmen's Compensation Act which affords an exclusive remedy.

We would first suggest that a distinction should be made between the relationship of statutory employer and employee under the provisions of K. S. A. 44-503, and the relationship of special employer and employee (loaned or borrowed employee) which existed under the common law. Where the appropriate facts are present the employment may bring the employee under the Workmen's Compen-

sation Act as a statutory employee or the facts may eliminate the relationship of statutory employer and employee and bring the workman under the act as a special employee. Different facts are necessary to create the two different relationships.

Under the common law an employee of a contractor or subcontractor was not considered an employee of the principal and such an employee, in the absence of a special statute, was not entitled to compensation from the principal or employer of the contractor or subcontractor under the original Workmen's Compensation Act. Various statutes, such as K. S. A. 44-503, have been enacted in the several states for the purpose of making the principal liable to such employees. This required a special inclusion statute and such employees have been designated as statutory employees to distinguish them from regular employees recognized under the common law. In order that a principal employer be liable for injuries to the employees of another, the relationship prescribed by the special statute must exist. (99 C. J. S., Workmen's Compensation, §107a, e, p. 362, 369; Larson's Workmen's Compensation Law, 1966, Volume 1A, §§49.00, 49.11.)

A special employee is a creature of the common law. The term refers to a lent employee. Once the relationship of lent employee or special employee and employer is established, the special employee becomes the servant of the special employer and assumes the position under the Workmen's Compensation Act as a regular employee and no special inclusion statute is necessary to give a special employee coverage. (99 C. J. S., Workmen's Compensation, §47a, p. 241.)

We will first consider whether the facts before us created the relationship of statutory employer and employee.

Most of our cases interpreting K. S. A. 44-503 are addressed to the question: When is the contracted work part of the regular trade or business of the statutory employer? In this case we have the additional question: Did the facts as related create a contractual relationship such as anticipated by the provisions of the statute? The statute provides insofar as material here:

"(a) Where any person (in this section referred to as principal) undertakes to execute any work which is a part of his trade or business or which he has contracted to perform and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay any workman employed in the execution of

the work any compensation under this act which he would have been liable to pay if that workman had been immediately employed by him; . . .

"(d) This section shall not apply to any case where the accident occurred elsewhere than on, in or about the premises on which the principal has undertaken to execute work or which are otherwise under his control or management, or on, in or about the execution of such work under his control or management."

Although the statute is to be liberally construed it is not every relationship that constitutes a contract such as is intended by the act. It is clear that the term "contractor" was not used in its all-inclusive sense. So construed, the statute would lead to absurd and inconsistent results. There is hardly a human relationship that does not involve some form of tacit consent or agreement. The *modus operandi* between the appellee and Builders Steel Company, reflected from the foregoing statement of facts, proves a relationship of buyer and seller and clearly negatives a contractual relationship between them. If the statute were to be applied to an ordinary sale of merchandise commerce and business dealings would be seriously hampered.

We are forced to conclude that a sale and delivery of merchandise is not such a contractual relationship as is anticipated by K. S. A. 44-503. This court has not had occasion to pass on the specific question but the general rule would appear to be as stated. In 99 C. J. S., Workmen's Compensation, §107, p. 369, we find the following statement in connection with the statutory relationship:

"The compensation act does not apply where the transaction between the immediate employer and the person sought to be held liable as his employer is that of purchase and sale, . . ."

The rule stated is subject to the exception that when the contract to sell is accompanied by an undertaking by either party to render substantial services in connection with the goods sold, that party is a contractor within the meaning of the statute. The rule is also subject to the exception that the transaction must not be a mere device or subterfuge to avoid liability under the Workmen's Compensation Act. The employee does not contend that either exception is an issue here. Different facts and different provisions of statutes render cases from other states of little value as precedents, however, those wishing to research the specific question further will find somewhat similar situations and a comparable ruling in *Wells Coal & Dock Co. v. Industrial Commission*, 224 Wis. 546, 272 N. W. 480; *Hobbs-Western Co. v. Craig*, 209 Ark. 630, 192 S. W. 2d 116; *Brothers v. Dierks Lumber & Coal Co.*, 217 Ark. 632, 232 S. W. 2d 646;

*Richardson v. Jones*, La. App., 163 So. 2d 119; *Wysinger v. God-frey*, La. App., 86 So. 2d 597; *Hooks v. Wayne County Road Comrs.*, 345 Mich. 384, 76 N. W. 2d 9, and *Heider v. Stoughton*, 150 Neb. 741, 35 N. W. 2d 814.

In support of its contention that the relationship of statutory employer and employee existed, the appellee relies on *Hoffman v. Cudahy Packing Co.*, 161 Kan. 345, 167 P. 2d 613; *Lessley v. Kansas Power & Light Co.*, 171 Kan. 197, 231 P. 2d 239; *Hataway v. Proctor & Gamble Manufacturing Co.*, 195 Kan. 335, 405 P. 2d 350, and particularly *Hanna v. CRA, Inc.*, 196 Kan. 156, 409 P. 2d 786, where this court stated at page 159:

"This court has laid down two rather definite tests by which to determine whether the work covered by a contract is part of the principal's trade or business, i. e., (1) is the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's trade or business? (2) is the work being performed by the independent contractor and the injured employee such as would ordinarily have been done by the employees of the principal?

"If either of the foregoing questions is answered in the affirmative the work being done is part of the principal's 'trade or business,' and the injured employees sole remedy against the principal is under the Workmen's Compensation Act."

It need only be noted that in these cases the original employer went on the premises of the principal under contract to do substantial construction work. Under such a situation a contractual relationship under the statute was not in question. It remained only to be determined whether the work being done was part of the principal's trade or business. Under the facts in the case under consideration, the transaction being that of a purchase and sale and not such a contractual relationship as is anticipated by the statute, the rule does not apply.

It remains to be determined whether the relationship of special employer and employee (loaned or borrowed employee) was created as a matter of law under the facts in this case.

It is impossible to lay down a rule by which the status of a person performing a service for another can be definitely fixed as an employee, as ordinarily no single feature of the relation is determinative, but all must be considered together and each case must depend on its own peculiar facts. A number of factors have evidentiary value, the most important of which is the degree of control retained by the person for whom the work is being done. In order to determine the actual relationship of the parties under any employment, the

courts will look to all the circumstances involved in the particular case. (*Mendel v. Fort Scott Hydraulic Cement Co.*, 147 Kan. 719, 722, 78 P. 2d 868.)

The test for determining when a relationship of special employer and employee is created is set forth in Larson's Workmen's Compensation Law, 1966, Volume 1A, §48.00, p. 710, as follows:

"When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if

"(a) The employee has made a contract of hire, express or implied, with the special employer;

"(b) The work being done is essentially that of the special employer; and

"(c) The special employer has the right to control the details of the work.

"When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation."

The test of special employment, as above set forth, bringing a workman within the provisions of the Workmen's Compensation Act, appears to have been generally approved. (See 99 C. J. S., Workmen's Compensation, §47, p. 241.) This court has applied the test in *Mendel v. Fort Scott Hydraulic Cement Co.*, supra, and also in *Schafer v. Kansas Soya Products Co.*, 187 Kan. 590, 358 P. 2d 737 and *Gilliland v. Kansas Soya Products Co.*, 189 Kan. 446, 370 P. 2d 78, although not making a careful distinction between statutory and special employees in the last two cases. We present the following cases for those wishing to extend their research into decisions of other states: *Wall v. Penn Lumber & Mill Works*, 171 Pa. Superior 512, 90 A. 2d 273; *Ridgeway v. Industrial Acc. Com.*, 130 C. A. 2d 841, 279 P. 2d 1005; *National Auto. Ins. Co. v. Ind. Acc. Com.*, 23 C. 2d 215, 143 P. 2d 481; *Silberman v. Ind. Acc. Com.*, 21 C. 2d 609, 134 P. 2d 228; *Texas Employers' Insurance Association v. Baker*, Ct. of Civ. App., Tex., 278 S. W. 2d 419; *Jones v. George F. Getty Oil Co.*, 92 F. 2d 255; *Shamburg v. Shamburg*, 153 Neb. 495, 45 N. W. 2d 446, and *Crepps v. Industrial Com.*, 402 Ill. 606, 85 N. E. 2d 5.

It would serve no useful purpose to attempt to extend in detail by specific examples the three requirements set out above as essential to the creation of a special employment relationship. The three tests have been detailed and broadened in the treatise by Larson and also by Corpus Juris Secundum in their citations given above.

Appellee relies on *Bright v. Bragg*, 175 Kan. 404, 264 P. 2d 494. In the *Bright* case the appellant was a truck driver of the Advance Furnace Company which sold three loads of sheet metal to Bragg,

doing business as Bragg Furnace Company. One of appellant's duties was loading, hauling and unloading sheet metal for his employer. Appellant was injured on appellee's premises while helping to unload and stack, in designated places, the sheet metal under the appellee's direction and supervision. Insofar as the opinion laid down and followed the rule for determining the actual relationship and liability of the parties as special employer and employee, the opinion and the decision are approved. However, insofar as the opinion concludes that—

"Appellee was engaged in the business of 'Sheet metal repair and installation of heating units.' For the prosecution thereof he undertook to obtain the sheet metal in question. *He contracted with intervenor to furnish it.* In the process of complying with the agreement one of intervenor's workmen was injured. We think such workman would have been entitled to receive compensation from appellee the same as though he had been immediately employed by appellee. (G. S. 1949, 44-503.)" (p. 410. Emphasis supplied.)

it is disapproved for the reason the relationship between the seller and the buyer was that of vendor and vendee, not that of principal and contractor as the term is to be understood in K. S. A. 44-503.

It will suffice to say without again reviewing the testimony heretofore presented that the evidence is conflicting on whether appellant was a loaned employee and on the three questions of (1) whether the employee had made a contract, expressed or implied, with the special employer; (2) whether the work being done was essentially that of the special employer, and (3) whether the special employer had the right to control the details of the work. Factual questions remained for the determination of the trier of facts and it was error for the trial court to sustain a motion for directed verdict as a matter of law.

This court has consistently followed the rule that in reviewing the propriety of an order sustaining a motion for a directed verdict this court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon the motion must be denied and the matter submitted to the jury. (*Casement v. Gearhart,* 189 Kan. 442, 370 P. 2d 95; *Albin v. Munsell,* 189 Kan. 304, 369 P. 2d 323; *Lackey v. Price,* 190 Kan. 648, 378 P. 2d 19; *Johnston*

*v. Gann,* 193 Kan. 102, 391 P. 2d 1016, and *Toole v. Johnson,* 195 Kan. 88, 402 P. 2d 823.)

The judgment is reversed with instructions to grant a new trial.

APPROVED BY THE COURT.