No. 45,904

Robert V. Kirsch, *Appellant,* v. Dondlinger & Sons Construction Company, Inc., and Cecil E. Jordan, d/b/a Jordan Lathing Company, *Appellees.*

(482 P. 2d 10)

Opinion filed March 6, 1971.

*Emmet A. Blaes,* of Jochems, Sargent and Blaes, of Wichita, argued the cause, and *Lawrence McDonough,* of the same firm, was with him on the brief for the appellant.

*Gerald Sawatzky,* of Wichita, argued the cause, and *Mikel L. Stout,* of Wichita, was with him on the brief for appellee Dondlinger & Sons Construction Co., Inc.

*Kenneth H. Hiebsch,* of Gamelson, Hiebsch, Robbins and Tinker, of Wichita, argued the cause and was on the brief for appellee Cecil E. Jordan, d/b/a Jordan Lathing Company.

The opinion of the court was delivered by

Harman, C.: This is a negligence action brought by an architect against a general contractor and a subcontractor for personal injury sustained on a construction job. Following presentation of plaintiff's evidence before a jury the trial court sustained both defendants' motions for directed verdict and for involuntary dismissal. Plaintiff appeals.

Plaintiff's evidence revealed the following:

Plaintiff, an architect with about fifteen years' experience, was a partner in an architectural firm which had been employed by the Catholic Diocese of Wichita to design and oversee construction

of the Madonna High School in Wichita. Defendant Dondlinger and Sons Construction Company, Inc., was employed as the general contractor to construct the building. Defendant Cecil E. Jordan was employed as a subcontractor to install ceiling lath throughout the building.

Plaintiff's responsibilities included design and preparation of plans and specifications and inspection of the building and work in progress to see that the work was being properly done. He was required to make routine unsolicited inspections and also, when the contractor contacted him about particular problems, to inspect and consult with the contractor. On April 5, 1966, plaintiff was called to the construction site by defendant Dondlinger to make such a requested inspection and, while making that inspection, suffered the injury to his eye which is the basis of this suit.

At the time of the incident, the project had been seventy-five per cent completed. The building had been enclosed but its interior had not been finished and doors and trim had not yet been installed. The auditorium where the incident occurred was rectangular with a flat roof. The ceiling had a contour, the front portion being flared with the low point at the space between the stage and the seating area. There had been scaffolding erected under the ceiling on a contour the same as the ceiling so that the various workmen could stand on the scaffolding while working on the ceiling. The scaffolding was constructed by placing 4 × 4's upright and nailing 2 × 8's or 2 × 10's across them to lay planking on. The planking consisted of 2 × 10's with two to four inch spaces between the planks.

Defendant Jordan's employees had installed metal lath on the ceiling over part of the auditorium, commencing at the rear and working toward the stage. The lathing work entails the hanging of metal channel bars from cross-bars on the underside of the roof and the wiring of sheets of metal lath to the bottoms of the channel bars. The metal lath is a black mesh-like material which comes in sheets eight feet long and twenty-eight inches wide. When it is being tied by wire to the channel bars, it is over-lapped an inch on the sides and is also overlapped on the ends. The channel bars are thirteen and one-half inches apart so that a sheet of metal lath is attached to eight channel bars crossing the seven spaces between such bars. The metal lath is later covered and impregnated with plaster to form the finished ceiling of the interior portion of the building.

According to the testimony of a metal lather employed by defendant Jordan, produced as a witness for plaintiff, the customary method of attaching laths is to wire partially a complete row of sheets overlapping on the sides before starting on the next row; when a new row is started it must be overlapped with the ends of the previous row; the specifications require the overlapping; for this reason, the ends of the metal lath sheets toward which the work is progressing are left unwired and hanging until the next row is wired; in this matter the wiring of the laths to the channel bars at the ends of the laths, where they overlap, is done only once; the metal lath is flexible material and tends to hang down from its own weight until firmly wired on all channels above it. Plaintiff testified that in his experience of inspections he did not normally encounter metal lath hanging down.

Jordan's employees had to terminate their work at the end of March, 1966, because the scaffolding was not up over the front half of the auditorium. They had installed the lath as far toward the stage as they could with the scaffolding provided. They left the last twenty-seven inches of lath hanging down so it could be lapped over the next sheets to be put up after scaffolding was provided. This lath hung down one to two feet below the ceiling level.

Some time between March 31 and April 5, 1966, the scaffolding had been moved toward the stage by Dondlinger employees for the purpose of enabling the lathers and other tradesmen to complete their work in the ceiling area of the auditorium. The lathers and other workers in the auditorium had previously used strings of temporary electric lights. Between March 31 and April 5 the electric company was in the process of installing permanent electrical conduits and connections and for this reason electricity was not available for either temporary or permanent artificial light in the auditorium and no artificial lighting was in operation at the time of the incident. Natural light entered the auditorium through four double door spaces at the back of the auditorium, one door on each side of the auditorium at the juncture of the stage and the auditorium, a door at the rear of the stage, and a smoke-hatch opening in the ceiling over the stage. There was a low level of illumination from the light entering those sources and though the lighting was inadequate for workmen to work by, plaintiff, at the time in question, could see the decking adequately and sufficiently to traverse

the scaffolding to any point necessary. The stage area of the auditorium was lighter than other areas and the light grew progressively dimmer as one moved away from the stage area.

On April 5, 1966, plaintiff went to the construction site and was met by Dondlinger's vice-president and its construction superintendent. The vice-president requested plaintiff to accompany him to the auditorium to check the manner in which the channel bars for the metal lath ceiling had been hung by the lathers. The vice-president led plaintiff through the auditorium and up a ladder near the stage area to the top of the scaffolding with the superintendent following immediately behind. Upon reaching the top of the scaffolding plaintiff began inspecting the suspension system as requested. He inspected the area immediately adjacent to where the ladder was and then proceeded toward the back of the auditorium. He made no request for any kind of lighting. The vice-president remained near the ladder while the superintendent followed immediately behind plaintiff. After taking about five steps from where the vice-president was standing, plaintiff encountered the hanging metal lath, which punctured his eye.

The black ceiling lath could not be seen against the darkened ceiling and though the superintendent knew the metal lath was hanging down, neither he nor the vice-president gave plaintiff any warning whatsoever.

The foregoing evidence consisted of testimony by plaintiff, a metal lather employed by Jordan, and that of the two men who were with plaintiff on the scaffold at the time of his injury. An examining physician testified plaintiff stated to him that it was dark at the time his eye was injured.

In sustaining the motions for dismissal and for directed verdict at the conclusion of plaintiff's evidence the trial court held that as a matter of law plaintiff, by admissions in his own testimony, had convicted himself of contributory negligence and he had assumed the risk of injury. The principal question upon appeal is the propriety of that ruling.

For our purposes here the rules applicable to a motion for involuntary dismissal under K. S. A. 60-241 (b), as amended, where a case is being tried to a jury, are the same as those applicable to a motion for directed verdict under K. S. A. 60-250. They have been stated many times. In *Bendure v. Great Lakes Pipe Line Co.,* 199 Kan. 696, 433 P. 2d 558, we find this:

"This court has consistently followed the rule that in reviewing the

propereity of an order sustaining a motion for a directed verdict this court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon the motion must be denied and the matter submitted to the jury." (Syl. § 6.)

In *Smithson, Executor v. Dunham,* 201 Kan. 455, 441 P. 2d 823, we stated:

"The instances are relatively rare when the facts are such that a court should say that negligence has been established as a matter of law by summary judgment or at any other stage of the litigation. It is only when conduct can be said as a matter of law to have fallen below the standard of a reasonably prudent person that the question of contributory negligence may be taken from the jury and determined by the court. . . .

"Usually, questions as to negligence or contributory negligence are not subject to determination on summary judgment because the evidence and inferences, which might be implied therefrom, construed in the most favorable light against the movant, as required, leave in question a genuine issue as to some material fact." (p. 458.)

Defendants' contention, simply stated, is that plaintiff without request voluntarily moved fifteen to twenty feet south into an area of darkness where he knew he might encounter hazards, and therefore is barred from recovery both by contributory negligence and assumption of risk.

Plaintiff testified he was in the building by request to inspect the suspension system for the ceiling, that is, to check that the framework, suspension wires, channels and ties were properly made and spaced. He knew there was mesh work in the area but could not see it because of the darker ceiling and did not expect it to be hanging down. He was closely escorted by two of the general contractor's employees. He had to place his steps carefully and was watching the scaffold as he walked so he would not step into the spaces between the planking. He had walked five steps when he encountered the wire mesh. There was varying testimony as to the light condition on the scaffold although unquestionably it was poorer away from the stage area. Light conditions were described as "fairly good", "enough light you could see on all this scaffold" and "sufficient to traverse the scaffolding to any point that was necessary". Plaintiff testified he had begun inspecting the suspension system and there was enough light for him to see the channels and supporting structures he had been asked to inspect, although he could not see into the upper recesses of the auditorium ceiling.

We have not detailed the entire testimony but have stated sufficient to indicate variance in it as to the amount of light at the scene of injury. Defendants' interpretation of that evidence is a picture of almost total darkness—plaintiff's is one of light sufficient to do that which he set out to perform. The amount of light was a factor relevant to an appraisal of plaintiff's duty to anticipate peril and would figure strongly in determining whether he acted as a reasonably careful person under the circumstances—the standard by which his conduct is to be measured. There was also conflicting testimony regarding the practice of permitting loose ends of metal lath to hang down while installation was in progress.

Defendants rely on cases such as *Kurre v. Graham Ship By Truck Co.*, 136 Kan. 356, 15 P. 2d 463, and *Thompson v. Beard and Gabelman, Inc.*, 169 Kan. 75, 216 P. 2d 798, in which injured plaintiffs who had ventured into dark unfamiliar areas were held to be guilty of contributory negligence as a matter of law. But manifestly there is a difference in proceeding blindly into an unlighted area with which one is unfamiliar as the plaintiffs in the cited cases did, and proceeding into a dimly lighted area with which one is sufficiently familiar to entertain a reasonable belief he is aware of existing hazards and can avoid them (see *Huxol v. Nickell*, 205 Kan. 718, 721-722, 473 P. 2d 90).

Plaintiff did know of possible protrusions and obstructions in the area in which he was working but he disclaimed anticipation of the hanging metal lath. When a person has put himself in a dangerous situation and while there is injured by the negligence of another, it is not always easy to determine whether his physical presence at the time and place was one of the proximate causes contributing to the injury or merely the opportunity or occasion for it. In *Wainscott v. Carlson Construction Co.*, 179 Kan. 410, 295 P. 2d 649, this court stated:

"It is not in every instance where one exposes himself to a known danger and injury results that he is denied a right to recover, but only in that class of cases where the danger is so obvious and imminent that a person of ordinary prudence under like circumstances would not subject himself to it. Danger may lurk within every defective condition, and yet may not be of such character that men of ordinary prudence would hesitate to expose themselves thereto. The defect and danger therefrom must be such that knowledge, or imputed knowledge thereof, would cause an ordinarily prudent person to appreciate the risk therefrom. The principle is too well established to require a citation of authorities to support it, that mere knowledge of the danger of doing a certain act without a full appreciation of the

risk involved is not sufficient to preclude a plaintiff from recovery, even though there may be added to the knowledge of danger a comprehension of some risk. Mere knowledge of the offending instrumentality does not constitute contributory negligence as a matter of law." (p. 413.)

The trial court also determined plaintiff assumed the risk. (The parties do not here dispute availability of that defense as distinguished from its applicability.) A person does assume the ordinary risks of employment known to him or which by the exercise of reasonable care he should have known. Assumption of risk is founded on knowledge and appreciation of danger. (*Taylor v. Hostetler*, 186 Kan. 788, 352 P. 2d 1042). Here again plaintiff testified he had not in his experience encountered metal lath hanging down and had no reason to expect it to be in his path. Much of that which has been said respecting contributory negligence is likewise applicable to the defense of assumption of risk and need not be repeated.

Contributory negligence and assumption of risk become questions of law only when plaintiff's evidence so clearly establishes them that no other reasonable inference may be drawn therefrom. Although the question is a close one, we believe the evidence, viewed as it must be in the light most favorable to plaintiff, was such that reasonable minds could reach different conclusions on the issues of contributory negligence and assumption of risk; therefore those issues should have been submitted to the jury, and we so hold.

Each defendant strenuously advances in support of the trial court's judgment the contention plaintiff failed to produce any evidence of negligence by it. The trial court made no ruling on that issue although it might be argued that implicit in its finding of contributory negligence was a ruling of negligence on the part of defendants. Neither defendant has cross-appealed from such a ruling and upon that state of the record on appeal we do not reach the issue.

Two further items remain which should be mentioned since retrial must be had. Plaintiff complains of the trial court's ruling excluding two photographs offered by him. The photographs were of the scene of plaintiff's injury, taken the next day through the use of artificial light. They depict the scaffolding, suspension system, ceiling and metal lath hanging down. In addition to portraying a difference in illumination of the scene the pictures also show some

additional channeling put in position by Jordan's employees the day plaintiff was injured but after that incident. Plaintiff tendered the pictures with a request the jury be appropriately advised as to the circumstances of their taking.

Ordinarily admission of photographic exhibits rests within the sound discretion of the trial judge. (*McDonald v. Bauman*, 199 Kan. 628, 433 P. 2d 437; *Howard v. Stoughton*, 199 Kan. 787, 433 P. 2d 567). In view of the matters at issue here we cannot declare abuse of discretion in the exclusion of the exhibits.

Plaintiff further complains of trial error in the court's exclusion of the construction contracts entered into by both defendants, offered by him to show the extent of the duty owed him. We find no prejudicial error. Plaintiff's claim for relief was pleaded in his petition as one based upon ordinary common law negligence. At pretrial conference the issues were likewise defined with specific charges of negligence against each defendant. No mention was made of liability based upon contract, although it must be stated some ambiguity crept into the pretrial order eventually made with respect to undetermined issues of law, possibly by reason of doubt whether plaintiff should be treated as a business invitee or mere licensee. The contracts were listed as possible exhibits, purpose not stated. Prior to trial plaintiff sought to amend his petition so as to allege a claim for relief arising out of contract. This request was denied. Plaintiff was given the election to dismiss without prejudice and refile his action but he chose not to do so. No appeal was taken from the denial order.

We have examined the contracts. They are couched in general terms and provide no additional or different duty from that arising from common law. No specific method of protection is prescribed. Prejudicial error in the exclusion does not appear.

The judgment of the trial court sustaining defendants' motions for directed verdict and involuntary dismissal is reversed with directions for further proceedings consistent with the views herein expressed.

APPROVED BY THE COURT.

PRICE, C. J., dissenting:

I respectfully dissent from subdivision (1) of the syllabus and the corresponding portion of the opinion.

Plaintiff was no novice in matters of this kind. He was an ex-

perienced architect, and a part of his duties was to inspect progress of construction on buildings designed by him and his firm. That was his business, and was what he was doing at the time he was injured. He had made many inspections of structures at various stages of construction and completion, and was thoroughly familiar with the many hazards to be encountered in partially completed buildings. If there was sufficient light at the time and place in question he is presumed to have seen what was in plain view to be seen. If the light was insufficient then it was negligence to proceed in the darkness. In my opinion the trial court made proper disposition of this case and I would affirm the judgment.

SCHROEDER, J., joins in the foregoing dissenting opinion.