No. 47,481

MICHAEL L. ALBANESE, Surviving Father and Next of Kin of Donald Scott Albanese, and MICHAEL J. ALBANESE, Administrator of the Estate of Donald Scott Albanese, Deceased, *Appellees/Plaintiffs*, v. EDWARDSVILLE MOBILE HOME VILLAGE, INC., a corporation, *Appellant/Defendant.*

(529 P. 2d 163)

Opinion filed December 7, 1974.

*John C. Whitaker* and *D. Gary Hunter*, of Williamson, Cubbison & Hardy, of Kansas City, argued the cause and were on the brief for the appellant.

*Lynn R. Johnson*, of Schnider, Shamberg & May, of Kansas City, argued the cause, and *Charles S. Schnider* and *John C. Piper*, of the same firm, were with him on the brief for the appellees.

The opinion of the court was delivered by

FONTRON, J.: These lawsuits, two in number, stem from the death of an eight-year-old boy, Donald Scott Albanese. He was killed July 4, 1971, when the side of a ditch, in which he and four companions were playing, caved in and buried him. The first action is brought by the boy's father, Michael J. Albanese, as next of kin, to recover for the wrongful death of his son; the second has been filed by Mr. Albanese as administrator of Donald's estate to recover damages for pain, suffering and mental anguish sustained by Donald prior to his death. The actions were tried together by the agreement of parties and recovery was obtained in both. An appeal has been taken from each judgment and the appeals have been consolidated for hearing in this court.

Donald lived with his parents in a mobile home court, or village, owned and operated by the defendant, Edwardsville Mobile Home Village, Inc., hereafter referred to as the defendant or company. The ditch where the accident happened was located on the defendant's property. It had been constructed during 1969 for the purpose of draining water from a low area on the company's property. It ran in a northwesterly direction to a point immediately west of defendant's property line where it emptied into Mission Creek which, in turn, disgorged its waters into the Kansas river.

At the time of the tragedy a great deal of erosion had taken place in the ditch, and a segment of some two or three hundred fifty feet in length bore the appearance of what was described at the trial as a canyon or gorge. Pictures placed in the record portray the section of the ditch where the bank had caved in as being twice the height of a man in depth, with a sandy rock-strewn floor and steep precipitous walls. Testimony of one of the boys who played there fixed the depth at from 15 to 16 feet. There was considerable conflict in the evidence as to how long this condition had existed, and more will be said about that later.

Donald and four companions, two of whom were his own brothers, had gone to the drainage ditch on the day in question to play and dig caves. Donald hit the bank a couple of times with his shovel when suddenly it sheared off, half covering one of the other boys, and burying Donald completely except for part of an arm and hand. Being unable to extricate their stricken companion, the other boys ran for help. Mr. Albanese responded promptly and uncovered his son, but by that time Donald was dead.

Each of the petitions filed by Mr. Albanese predicated the defendant's liability on two theories: (1) negligence on the part of the defendant in failing to keep its premises in a safe condition for use of the residents of the mobile park village and (2) by maintaining an attractive nuisance on its premises. The trial court instructed the jury as to both theories of liability. One special question was submitted to the jury, and that in the wrongful death case. It read:

"State whether or not you find that Michael Albanese, the father, was guilty of any negligence that contributed to cause his son's injuries and death."

The jury's answer was "not guilty."

The basic dispute existing between the parties to this case has centered throughout the course of this litigation on Donald's status at the time of his death, i. e., was it that of licensee, or invitee, and what was the duty of care owed him? Five of the points raised by defendant are directed toward instructions, both those given and those refused, which had a bearing on the question of status and duty of care. The sixth point of error pertains to the admission of a photograph of the deceased youngster.

As stated in its brief on file with this court, the defendant "has repeatedly maintained that the deceased child held the status of a bare licensee and as such the defendant owed only the duty to refrain from willfully or recklessly injuring him." The instructions requested by the defendant followed this general theme, one of them even going so far as to instruct that Donald "occupied the status of a licensee" on the company premises, by reason of which no duty of care was owed "except to refrain from willfully, intentionally or recklessly injuring him." If the court correctly instructed the jury, a question to which we will first address ourselves, it would logically follow that it properly rejected the requested instructions.

Two of the four instructions to which the defendant takes exception, numbered 5 and 6, relate to negligence in general, and the duty which every person owes to exercise such care as an ordinary careful person would use under similar circumstances. The basis of the

objection was simply that ordinary care is not in this case. Instruction number 10 is on the attractive nuisance theory of the case and will be dealt with later in this opinion.

Instruction number 9 leaves generalities and proceeds to the specifics of the care which the law requires of a property owner to persons coming onto his premises. It reads as follows:

"The operator of a mobile homes court where many families live is not an insurer of the safety of the residents there. He owes, however, a duty to use ordinary care to keep in a reasonably safe condition those portions of the premises used in common by such families and to warn them of dangerous conditions upon the premises of which he knows, or should know of, by the exercise of ordinary care, and which are not known to them.

"The duty is limited, however. It extends only to those portions of the premises which residents or their children have either been expressly or impliedly invited to use, or to those portions which the operator might reasonably expect them to use.

"An invitation to use a particular portion of the premises may be implied from the circumstances, such as the customary use by the tenants or their children, the acquiescence by the proprietor in the habitual use of such portion of the premises, or the apparent holding out of such portion of the premises to a particular use by the tenants and their children, if such you find.

"Conversely, the same duty on the part of the proprietor to use ordinary care as explained above does not extend to portions of the premises to which the tenants or their children have been expressly or impliedly restricted from using, or to which the proprietor under all the circumstances has no reasonable expectancy that the tenants or their children will use. As to tenants or their children using such portions of the premises, the proprietor owes only the duty to refrain from willfully or recklessly injuring them."

We cannot fault this instruction. It appears to be a fair statement of the duty of care which rests upon a proprietor who rents or leases a portion of his premises to multiple tenants or residents, and we believe it was appropriately given in view of the evidence in this case. We are aware of no case which has applied the landlord-tenant rule of liability to the owner or operator of a mobile home facility, but we can suggest no reason why the rationale of the rule would not govern a trailer or mobile home court situation such as we have here.

The so-called "premises rule" is well stated in 49 Am. Jur. 2d Landlord and Tenant, § 805, pp. 760-761. The text recites:

"It is generally held that where the owner of premises leases parts thereof to different tenants, and expressly or impliedly reserves other parts thereof, such as entrances, halls, stairways, porches, walks, etc., for the common use of different tenants, it is his duty to exercise reasonable care to keep safe such parts of which he so reserves control, and if he is negligent in this regard, and a personal injury results by reason thereof to a tenant or to a person there in the

right of the tenant, he is liable, provided that the injury occurs while such part of the premises is being used in the manner intended. . . ."

See, also, 52 C. J. S., Landlord & Tenant, § 428, p. 191; 2 Harper & James, The Law of Torts, § 27.17, p. 1516.

In *Trimble v. Spears*, 182 Kan. 406, 320 P. 2d 1029, this court recognized the validity of the rule and cited numerous authorities in support. We shall not go into the facts of that case other than to say the plaintiff was on her way to a cleaning shop which occupied one end of a building owned by defendant, when she mistakenly opened a door fronting the sidewalk running along the building and fell down a stairway leading directly to the basement, receiving injuries in the fall. In the course of its opinion the court said:

"Liability [of the defendant] is based upon the obligation of the landlord to the tenants of different parts of the same building in reference to the halls, stairways, doors and et cetera of which he has kept in possession for their common use. His liability to persons other than the tenants is based upon the privity of those persons with the tenant who occupies a portion of the premises. In the use of the stairs, hallways, passageways, walks and the like over which the landlord retains control for the benefit of the tenants in common the persons in privity with any tenants are regarded as invitees on the premises either by express or implied invitation and the landlord owes them a duty to exercise ordinary care to keep those portions of the premises in safe condition." (p. 413.)

The court quoted the following passage from *Hinthorn v. Benfer*, 90 Kan. 731, 136 Pac. 247, where a tenant fell off a porch which had a defective railing:

". . . Where a portion of the building is let and the tenant has rights of passageway over stairs and entries in common with the landlord and other tenants, the landlord is bound to exercise reasonable care to render the halls and stairways safe for the uses which he invites others to make of them. (*McGinley v. Alliance Trust Co.*, 168 Mo. 257, 66 S. W. 153, 56 L. R. A. 334; *Readman v. Conway*, 126 Mass. 374; *Looney v. McLean*, 129 Mass. 33, 37 Am. Rep. 295.) The facts speak for themselves; the law is so well settled that it is unnecessary to cite other authorities." (pp. 733, 734.)

Application of the rule is limited by the requirement that the landlord have actual or constructive notice of the defective or dangerous condition before liability on his part will attach. (*Trimble v. Spears*, supra, p. 412.) This limitation is singled out in *Brunsilius v. Farmers & Merchants State Bank*, 143 Kan. 148, 150, 151, 53 P. 2d 476, where it is said:

"It may be conceded that this was a stairway and hall for the common use of tenants on the second floor of the building, and that defendants were under

the duty to use due care to keep them in a reasonably safe condition (*Hinthorn v. Benfer*, 90 Kan. 731, 733, 136 Pac. 247), and that they would be liable if, by the exercise of reasonable care, they could have discovered the unsafe condition and the risk involved therein, and could have made the condition safe. (See Restatement, Torts, §§ 357, 358, 359, and comments thereon.) There is no allegation in the petition that the defendants knew of the unsafe condition of the hall and stairway, or that such a condition had existed long enough for them to have known about it and had an opportunity to make the condition safe."

Courts have frequently given voice to the "premises rule" in situations involving apartment complexes, business buildings, and similar multiple occupancy structures and areas, and it seems to us the philosophy which underlies the rule is likewise appropriate where a property owner, operating a mobile home facility on his premises, lets out space to various residents. The questions for us to determine are whether there was evidence to justify the trial court in instructing the jury under the rule and whether the verdict may be supported on that basis. We believe the answer must be yes to both queries.

Donald lived with his father and other members of the family in the Edwardsville Mobile Home Village, a project having an area of 120 acres and containing 146 trailers at the time, with more abuilding. As a member of the Albanese family, Donald was a resident of the complex. The dangerous ditch and adjacent grassy field were component parts of the village area, and the entire area was owned by the defendant company.

The evidence is undisputed that when residents planned to move into the village they were assured that playgrounds and play equipment would be provided for the children (who numbered some 105 in July, 1971), but these assurances had not been fulfilled at the time of Donald's accident. As a consequence, children who lived in the village were wont to play in the grassy area adjacent to the neighboring ditch, and in the ditch, as well. There was evidence that this type of activity had been going on at least as far back as 1970, and was known to workmen employed by the village; that children were not prohibited from playing in and about the grassy area, or in the ditch, but were restricted only from going on the site where construction was in progress; and that the ditch was not fenced in any way, nor was it protected by warning signs.

No part of the area containing the grassy plot and the ditch was leased or rented by any village resident; all was retained by defendant. The villagers, both children and grownups, used the area

for play and recreation. The area was within easy access of the occupied portion of the village and was open to view. In our opinion it could be inferred that the defendant permitted the villagers to use the area for recreational purposes and, by implication at least, invited that sort of use by the residents.

Was the condition of the ditch hazardous and if so did the defendant know, or should it have known, of the danger? A number of village residents testified they thought the canyon section of the ditch was dangerous and at least one witness opined that the danger had existed since the previous year. Photographs of the canyon admitted in evidence substantiate their opinions and leave little doubt that the jury would be justified in finding the canyon presented a hazardous condition.

A cleavage developed during the trial with respect to notice. Robert A. Cater, who has served as construction manager for the village since its inception, and who designed and supervised construction of the ditch, testified as a witness for the defendant. Parts of his testimony were somewhat contradictory and evasive, but an overall assessment would be that he saw no canyon-like erosion when he visited the area about two weeks before the accident and that, in his opinion, the canyon had been formed since that visit. He testified, also, that he did not consider the canyon dangerous in the condition it was when Donald was killed and even had he known it was in that condition, he would not have fenced the area or posted signs around it.

As opposed to Mr. Cater's evidence, there was testimony that in 1970 the canyon was ten or twelve feet deep, and even then was dangerous. A geotechnical engineer, William L. Durbin, testified on plaintiff's behalf that in his opinion the canyon could not have been created in a two-week period; that the erosion was gradual from the time the ditch was dug; that the heaviest rainfall occurred in the month after the ditch was built; and that a heavy rain which fell in June, 1971, could not alone have caused the deep gorge. Mr. Durbin testified that the soil in the area was silt over sand; that it had very little cohesiveness and essentially no erosion resistance; that the soil had no binder. Mr. Durbin's testimony as to type of soil finds corroboration in Mr. Cater's acknowledgment, on cross-examination, that he knew the soil was very susceptible to erosion unless treated properly and that had a concrete flume been put in there would have been little erosion.

We believe the evidence ample to justify the inference that the

defendant's employees and especially its manager, had they been exercising due and ordinary care, should have known of the hazardous condition which according to plaintiff's evidence, had existed in the ditch at least as early as 1970, and that, consequently, the defendant was chargeable with constructive notice.

In our opinion, instruction number 9 was properly given in view of the entire evidence, and the inferences to which it was susceptible. The defendant vigorously asserts it was entitled to have instructions given covering its theory of the case, and this is true. A court ought fairly to present the law applicable to the theories of both parties where there is evidence to support them. (*Morse v. Ryland,* 58 Kan. 250, 48 Pac. 957; *Prior v. Best Cabs, Inc.,* 199 Kan. 77, 427 P. 2d 481.) However, in this case we believe the court did just that. On the one hand the court set forth, in the first and third paragraphs, the duty of reasonable care required of a proprietor of a mobile home court to keep his premises safe for his tenants and residents. On the other hand, in the second and fourth paragraphs, the court instructed on the limitations of the rule. In effect, the court instructed the jury as to Donald's status while on defendant's premises and the different standards of care imposed on a proprietor with respect to an invitee and a licensee. The instruction was nicely counterbalanced in giving expression to the contrasting theories of the litigants, leaving it for the jury to determine whether liability was present.

Did the trial court err by instructing the jury on attractive nuisance? We believe not. This doctrine has a long history in the annals of Kansas jurisprudence and its components should be quite well known to members of our bar. In the recent case of *Bartlett v. Heersche,* 204 Kan. 392, 462 P. 2d 763, this court probed the doctrine in some depth and synthesized the various elements in Syllabi 2, 3 and 4.

"The attractive nuisance doctrine prevailing in this jurisdiction is based upon negligence. Where the owner or operator of premises maintains upon such premises a condition, instrumentality, machine, or other agency which is dangerous to children of tender years by reason of their inability to appreciate the peril therein, and which reasonably may be expected to attract children of tender years to the premises, the owner or operator of the premises is under a duty to exercise reasonable care to protect such children against the dangers of the attraction.

"The attractive nuisance doctrine applies only to latent dangers. What the law considers to be a latent danger is not confined to things hidden from the eye alone. It extends to things hidden from the appreciation of the person

injured, hidden from the combination of eyesight and knowledge—hidden knowledge of the properties of the things which the eyesight observes. It may thus be said a concealed danger extends to things hidden from appreciation of persons injured, as well as to things hidden from the eye.

"Where the condition maintained on premises constitutes an attractive nuisance, simple negligence on the part of the operator and the owner in failing to maintain an adequate fence, as required by ordinance, is sufficient to impose liability upon both the operator of the premises and the owner of the premises, on facts more particularly stated in the opinion."

In the instant case, of course, there was no ordinance requiring the area to be fenced. However, the absence of fencing and warning signs were matters properly to be considered by the jury in deciding whether the defendant had exercised due care under the circumstances.

In the *Bartlett* case the attraction was a sand pit. In *Brittain v. Cubbon*, 190 Kan. 641, 378 P. 2d 141, it was an old building which had been razed and its debris scattered about. In the instant case it was a deep gulch or canyon.

The propensity of small boys to dig, to dig in the earth, to dig caves, to dig caverns, to dig plain holes in the ground, has ancient roots. It is nearly as well known to anyone who ever dealt with a boy, as his propensity to run, to scuffle, to throw stones, to play in the soil and to overlook washing his hands. We think it may be said as a matter of plain common knowledge that the condition prevailing in the defendant's ditch would prove an enticement to adventure; an irresistible invitation to boys of tender years to give vent to the primeval urge to dig caves, unaware of latent dangers. In other words we have little reluctance in saying that the canyon might reasonably have been expected to attract and lure young boys who might not sense the odor of hazards.

The defendant insists the eroded ditch was but a counterpart of what is commonly found in nature. For natural hazards, the defendant goes on, landowners are not to be held responsible. Much reliance is placed on our decision in *Zagar v. Railroad Co.*, 113 Kan. 240, 214 Pac. 104, where liability under the attractive nuisance doctrine was denied. In that case a small boy was injured when a portion of the bluff along the railroad track gave way and fell on him as he was standing beside a cave dug into the face of the bluff by some other boys. The railroad company had excavated the bluff somewhat at its base making it steeper than it had been in its natural formation. This court said that the defendant, in extending its use of the right of way, changed the bluff only

by making it steeper; that many bluffs were just as steep as this one after excavation; and that the defendant had constructed nothing different from what is found in a natural bluff which would induce boys to make it their playground.

We believe the factual background of the present case distinguishes it from *Zagar*. The defendant's ditch was not a natural ditch—it was dug; there was no ditch at all on defendant's land until one was constructed to drain part of its property. While the ditch may originally have been seeded to grass, the evidence would seem to indicate that very little, if any, attention in the way of maintenance or inspection was provided over the years. Moreover, there is no evidence that the canyon-like gorge which developed in this ditch was normally found in drainage ditches, or that the danger presented was one that commonly occurred in nature. The plaintiff's evidence, indeed, is quite to the contrary. Mr. Durbin, the professional engineer called by plaintiff, testified the canyon which had been created was not similar to or a reproduction of what occurs in nature; that the erosion was much more severe, much more critical; that the canyon was "not a reproduction of the erosion that has occurred by natural forces."

In our opinion a rational conclusion may be drawn from the evidence that the danger posed by the conditions existing in the ditch where Donald was killed, exceeded and was different from that which is normally found in nature; that the canyon was attractive to children; and that it could easily have been guarded.

We find no error in the instructions which the trial court gave or in the court's refusal to give those which the defendant requested. The defendant's theory of the case, as we have said, was adequately covered by the instructions which were given.

One final point remains—the defendant contends a group picture of Donald with three of his playmates was erroneously admitted into evidence. No objection was interposed to a photograph, previously offered, showing Donald, alone, and it is argued that the group picture had no purpose except to arouse sympathy; that it had no probative value; and that it was prejudicial to the defendant's cause. Conceding for argument's sake that the group picture had little, if any, probative value as to any of the issues in contention, we would be hard put to say that its admission constituted reversible error. (*State v. White*, 211 Kan. 862, 865, 508 P. 2d 842.) Ordinarily the admission of photographic exhibits rests within the sound discretion of the trial judge (*Kirsch v.*

*Dondlinger & Sons Construction Co., Inc.,* 206 Kan. 701, 708, 482 P. 2d 10) and this court has gone far in upholding a trial court's ruling in this area. (*State v. Turner,* 193 Kan. 189, 392 P. 2d 863; *Kimple v. Foster,* 205 Kan. 415, 420, 469 P. 2d 281; *State v. Randol,* 212 Kan. 461, 465, 466, 513 P. 2d 248.) While the group photograph might well have been rejected, we do not view its admission as rising to the height of prejudicial error.

The judgment of the court below is affirmed.