260 So.2d 76 (1972)
Paul DUFRENE, Jr., and Mrs. Rosalie Dufrene
v.
Dr. Harold FAGET and St. Paul Fire and Marine Insurance Company.
No. 4864.
Court of Appeal of Louisiana, Fourth Circuit.
March 21, 1972.
Rehearings Denied April 18, 1972.
Writ Refused May 18, 1972.
*77 Peltier & Peltier, Thibodaux, and Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, Donald L. Peltier, Thibodaux, for plaintiffs-appellees.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, H. Martin Hunley, Jr., New Orleans, for defendants-appellants.
Before CHASEZ, STOULIG and BAILES, JJ.
STOULIG, Judge.
This suit was brought by plaintiffs, alleging that Dr. Harold Faget was guilty of dental malpractice which resulted in Mrs. Dufrene's swallowing a small needlelike instrument known as a root canal reamer. Surgery was subsequently necessary to remove this instrument, which measured approximately 1¼ inches in length, from the plaintiff's duodenum. After a trial on the merits before the presiding district court judge, the defendant was found to have been guilty of negligence, and plaintiffs were awarded $26,657.40 in damages, which included $1,657.40 in medical expenses. From that judgment defendants have lodged this suspensive and devolutive appeal in which they allege the trial court erred in the following respects:
1. In concluding that Dr. Faget's treatment was improper;
2. In finding that Dr. Faget was guilty of a breach of the standards of care customarily prevailing in the dental community; and
3. In concluding that Dr. Faget left the root canal reamer in plaintiff's mouth and turned away to get an instrument with which to retrieve it.
Alternatively, defendants maintained that the award was grossly excessive and should be reduced.
As this suit presents both factual and legal issues, a determination of the former must first be made in order that the latter be placed in proper perspective.
There were no witnesses to the incident leading to this suit other than the parties themselves, and their versions of precisely what took place are divergent and irreconcilable.
Mrs. Dufrene testified that on December 23, 1966, she entered Dr. Faget's office complaining of a severe toothache. Dr. Faget made an examination and advised her that although her tooth could be saved, it would required extended treatment. Mrs. Dufrene testified that he gave her no explanation of the nature of her problem. Nevertheless, she elected to save the tooth, whereupon Dr. Faget administered to her four oral injections of anesthesia, which she stated made her mouth and gums totally numb: "Everything was completely out."
*78 Dr. Faget, working alone, began his procedure, which required the use of the root canal reamer. According to Mrs. Dufrene, he turned away from her at one point in the operation, presumably to get an instrument, and when he turned back said: "My God you swallowed it." Mrs. Dufrene replied "Swallowed what?" and Dr. Faget said, "A small needle that I laid on your tongue." Mrs. Dufrene stated that she was "petrified," and asked Dr. Faget if he would like for her to try to cough it up. He replied affirmatively, but her efforts were to no avail. After requesting him to telephone her doctor, she proceeded to Browne-McHardy Clinic where she saw Dr. John T. Leckert. An X ray taken there confirmed that she had swallowed the instrument. It was hoped that the root canal reamer would be eliminated naturally, but a later examination revealed it was lodged in her duodenum from where it was surgically removed on January 16, 1967.
Dr. Faget's version of the events surrounding the ingestion of the reamer are substantially different from Mrs. Dufrene's and are, as noted, irreconcilable.
He testified that Mrs. Dufrene entered his office on December 23, 1966, complaining of a severe toothache which he diagnosed as acute pulpitis of the lower left second bicuspid tooth. He explained that he could remove the tooth or treat it through endodontic procedures, i. e., removal of the infected pulp tissue within the tooth. She chose the latter alternative. Two, three or possibly four injections of a standard local anesthetic were administered, after which Dr. Faget isolated the tooth with cotton rolls and installed a saliva ejector and began the procedure, which involves the insertion of the reamer into the root canal of the tooth. This instrument is held between the thumb and forefinger and is manipulated with a vertical circular motion, the purpose of which is to extract the infected pulp. Dr. Faget had almost completed this process when the reamer slipped from his grasp and fell laterally over the top of the patient's tongue. Mrs. Dufrene then immediately sat up and leaned over the cuspidor which was just to her left. Dr. Faget stated that he was excited and yelled, "Don't swallow anything." Mrs. Dufrene said, "What are you talking about?" He then said, "Please let me examine your mouth," whereupon he observed that the instrument was gone and informed her that she had very likely swallowed it. Dr. Faget testified that he then telephoned his father, a physician, who advised him to have Mrs. Dufrene see her personal physician immediately. What transpired thereafter has already been related and is not contradicted by Dr. Faget.
After a lengthy trial of the matter the district court made the following factual determination found in its written reasons for judgment:
"It is the opinion of the Court that it is virtually impossible for the events to have occurred as described by Dr. Faget.
"On the other hand the series of events as described by Mrs. Dufrene is logical and makes sense.
"It is the opinion of the Court that Dr. Faget took his hand away from Mrs. Dufrene's mouth and his eyes off of the canal root reamer, and reached for an instrument to remove the reamer.
"Further, Dr. Faget knew that Mrs. Dufrene's mouth would be completely numb and he failed initially to instruct her to keep her mouth open and not to swallow. In addition, at the crucial moment, he took his hand away from Mrs. Dufrene's mouth and his eyes off of the canal root reamer, and failed to protect her from swallowing the canal root reamer."
We have made a careful review of the testimony contained in the record and conclude that the findings of the trial court must be affirmed. Although we are not prepared to say that Dr. Faget's version of the unfortunate incident is "virtually impossible," we do agree that Mrs. Dufrene's statement of what occurred is certainly the *79 more logical of the two. It is particularly noteworthy that Mrs. Dufrene's mouth was heavily anesthetized and it is unlikely that the dropping of the reamer would have caused her to lunge toward the cuspidor. (Although Dr. Faget could not state whether the instrument fell over a portion of her tongue which had sensitivity, Mrs. Dufrene stated positively that she felt nothing.) Furthermore, swallowing the instrument while surging toward the expectorating bowl would seem to be extremely difficult at best.
On the other hand, logical support for Mrs. Dufrene's version and the trial court's conclusion that Dr. Faget removed his hand from her mouth and reached for an instrument to remove the reamer can be found in the statements of two of the dentists (both defense witnesses) who testified.
Dr. Jack Hudson and Dr. Paul Morris stated that if they dropped a root canal reamer in a patient's mouth they would sometimes remove their hand to reach for another instrument to pick it up. Dr. Hudson explained: "Because when that reamer falls, your fingers generally cannot pick it up in the floor of the mouth or on the tongue. There is a problem and generally you would reach for a supplemental instrument." And Dr. Morris, when asked whether he would ever withdraw his hand from the patient's mouth before picking up a reamer he had dropped, stated: "I probably at one time or another, at least, took my other hand and put in there in such a way that, or to protect this from being swallowed and, maybe, reach for another instrument to pick it up with or something of this sort."
While it is true that Dr. Faget categorically denied that he ever turned away, Mrs. Dufrene insists that he did, and just as strenuously insists that the accident occurred in a manner which is totally irreconcilable with his version of the incident. In a situation such as this the trial judge, who is in a position to observe the witnesses and note their demeanor, is, obviously, far better able to determine their credibility than is the appellate tribunal. For this reason our jurisprudence has granted to him great discretion in making a determination of facts, and his opinion is to be accorded great weight and may be reversed only for manifest error. Ricks v. Associated Indemnity Corporation, 242 So.2d 346 (La.App. 4th Cir. 1970); Gay v. Travelers Insurance Company, 234 So.2d 241 (La.App.2d Cir. 1970); Readco Industries, Inc. v. Myrmax Specialties, Inc., 236 So.2d 573 (La.App. 1st Cir. 1970) (writ refused, 256 La. 865, 239 So.2d 362); Bagley v. Commercial Union Ins. Co. of New York, 216 So.2d 102 (La.App. 1st Cir. 1968). Our review of the testimony and evidence presented at trial has convinced us that no such error was committed and we, accordingly, affirm his findings.
Having reached this conclusion, we must now determine whether under this given set of factual circumstances, the defendant is guilty of malpractice.
The leading case of Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954), sets forth the duty imposed upon physicians and dentists as follows:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. * * *" 73 So.2d at 782.
In accordance with this rule, we must determine whether the skill exercised by Dr. Faget was commensurate with that customarily employed in his locality and, further, whether or not he used reasonable care *80 and diligence, along with his best judgment in the application of this skill in the instant case.
An examination of the testimony of the dentists makes it abundantly clear that the dropping of the root canal reamer, per se, did not constitute negligence on Dr. Faget's part. All three of the dentists who were presented by the defendant (none was called by plaintiff) testified that it was possible for a root canal reamer to fall from the hands of a dentist using ordinary reasonable care. Although it apparently does not happen often, there are several factors, including the fact that saliva may make the instrument slippery, movement by the patient of his head, and resistance of the reamer to manipulation, which could cause the instrument to fall. The fact that Dr. Faget could not explain upon examination what made him drop the reamer in Mrs. Dufrene's mouth does not affect our conclusion that this action did not constitute negligence on his part.
The most serious charge against Dr. Faget is that in turning away from Mrs. Dufrene to get another instrument he negligently abandoned her without giving her any warning or taking action to prevent her swallowing the instrument. A disposition of this charge is made difficult by the fact that Dr. Faget denies the accident occurred in the above-described manner. Nevertheless, having found no manifest error, we are bound by the trial court's factual findings (with which we concur) and will assess his actions in accordance with those determinations and the testimony of the experts who testified.
Dr. Pittari was asked upon examination whether he would at any time entirely withdraw his hand from a patient's mouth, leaving a loose root canal reamer in the patient's oral cavity. His answer: "Only on one occasion would I do this. And that would be when I am taking an X ray." (It is noted that at this time the reamer is engaged the entire length of the tooth.) When asked what he would first do were he to drop a reamer inside the oral cavity Dr. Pittari replied: "Again, I think here I would caution the patient to remain perfectly still and not to swallow and then try to recover the instrument."
Dr. Morris was questioned relative to the dropping of a reamer inside a patient's mouth and the following dialogue ensued:
"A Well, I will tell you, I don't take my eyes off of it. I know that I can remember one timeI have to take that backthat I did drop one beside the tongue and you just don't take your eyes off of it until you have it. That was the way I did.
"Q When you did drop that
"A I stop everything.
"Q Sir, I am interrupting you. I don't intend to. Finish your statement.
"A Well, I just didn't take my eyes off of it until I had it in my grasp again.
"Q Did you go after it quickly?
"A Yes, sir. I will admit that.
"Q Did you ever withdraw your hand from that patient's mouth before you had that reamer back in your hand?
"A I probably at one time or another, at least, took my other hand and put it in there in such a way that, as to protect this from being swallowed and, maybe, reach for another instrument to pick it up with or something of this sort."
The testimony of Dr. Hudson, the only other dentist to appear other than Dr. Faget, is less specific. Although Dr. Hudson did state that if he dropped the reamer he would remove his hand from the patient's mouth to pick up another instrument to retrieve it, his testimony does not indicate whether he would insert the other hand or what, if any, other preventative action he would take. Therefore, his testimony on this crucial point is of limited value.
*81 After carefully considering the relevant testimony of the witnesses and all of the circumstances surrounding the incident, we are of the opinion that Dr. Faget failed to use reasonable care and diligence in application of his skills. After dropping the reamer in Mrs. Dufrene's mouth he took no steps whatsoever to insure that she would not swallow it. He was aware that her mouth was anesthetized and that she therefore lacked full oral sensitivity and control, and should have realized that the reamer was susceptible of being inadvertently swallowed. Yet he did nothing. He did not see fit to keep one of his hands in her mouth as suggested by Dr. Morris, or advise her to remain still and not to swallow as suggested by Dr. Pittari. In our opinion the conclusion is inescapable that Dr. Faget was negligent and that his negligence was the proximate cause of Mrs. Dufrene's unfortunate experience.
We address ourselves now to the issue of damages. As previously noted, appellant has alternatively argued that the trial judge exceeded the permissible bounds of his discretion in awarding Mrs. Dufrene $25,000 in addition to her total medical expenses of $1,657.40.
According to Mrs. Dufrene's testimony she was in good health prior to the operation. Following her discharge from the hospital, however, she was in and out of bed for two months, and was highly tensed and plagued with fatigue, diarrhea, nausea and urinary problems, and had difficulty sleeping. It was eight months before she could return to helping her husband at their lumberyard, and even then she was not able to work up to her former capacity. Her ability to perform household duties was very limited following the operation, and though she could not state how long this disability lasted, she testified at the time of trial that she was still not back to full capacity. She also stated that symptoms which bothered her following the operation, though not constant, had persisted and she did not seem to be able to rid herself of them. Mrs. Dufrene described her experience as a nightmare, and stated that she considered having to undergo the operation a great insult. Her testimony was corroborated by that of her husband, Paul Dufrene.
Dr. Claude Craighead, the general surgeon who removed the reamer from Mrs. Dufrene's duodenum by a 3 to 4 inch surgical incision, testified that her post-operative recovery period was normal and there were no complications from the surgery. Dr. Craighead stated that following such an operation a patient should be able to return to heavy work in about six weeks.
Mrs. Dufrene's personal treating physician, Dr. Gordon McHardy, a gastroenterologist, did not testify, but the parties stipulated his medical reports and correspondence with plaintiff's attorney into the evidence.
A review of a letter dated April 25, 1967, addressed to plaintiff's attorney reveals that he initially ascribed her complaints of diarrhea, urinary difficulty and rectal irritation to secondary reaction to wide-spectrum antibiotics. However, by April 21, 1967, he found a definite improvement as relating to her bowel problem, though cautioned that it be recognized as an intermittently recurrent difficulty. He found residual digestive distress, further urinary difficulty (with evidence of infection process) and intense nervousness on the part of the patient. He stated:
"It is my studied impression that Mrs. Dufrene, being emotionally unstable prior to her unfortunate experience, has had an accentuation of her nervous state. Her concern over her illness and the emotional trauma related thereto, her anxiety over this, her first surgical experience, and her continued emotional instability are out of proportion to what one might expect in the average individual, but not out of proportion to an individual of Mrs. Dufrene's emotional reserve.

*82 "The physical impairments that have persisted since her operation, namely, those related to diarrhea, rectal irritation, and urinary infection, are all related to her surgery and to her pre- and postoperative management, and should be considered a part of this illness and experience.
In a letter dated June 14, 1967, Dr. McHardy wrote to plaintiff's attorney:
"There has been no appreciable change in relation to the evaluation of Mrs. Dufrene since my report to you under the date of April 25.
"Since then, I have seen her on 5-4-67 and 6-6-67. It is my impression that her present complaints are of emotional origin, that is, a manifestation of nervousness. I do not find any evidence of organic disease as a residual of her foreign body impaction and surgical procedure for correction thereof."
The last report of Dr. McHardy which is included as part of the record was apparently made shortly after a visit of October 8, 1968, approximately 2½ years before trial. After finding that the patient complained of essentially the same symptomology that had persisted, in varying degrees of severity since her operation, he stated:
"* * * It is my evaluative opinion that these manifestations are those of disturbed secretion and motility, rather than actual disease, although the manifestations closely mimic those of an irritation of the duodenum, the segment from which the offending foreign body was removed."
A review of the jurisprudence reveals no case where an evaluation of similar injuries has been made. Nevertheless, a thorough examination of the testimony convinces us that an award of $25,000 in addition to medical expenses to Mrs. Dufrene is clearly excessive.
We do not doubt that the experience she endured was a nightmare in the truest sense of the word, particularly for a woman of her emotional reserve. Nor do we doubt that her symptomology was real, though we note that her own testimony and the increasing infrequency of her visits to Dr. McHardy indicate it is diminishing both in intensity and recurrence.[1] But, despite these facts, some reasonable relationship, some justifiable connexity must be maintained between the injury sustained and the award granted. We are fully aware of the difficulty which this task often presents and the wide discretion vested in the trial judge in making his determinations. Notwithstanding this fact, it is our considered opinion that this judgment is nevertheless excessive. Accordingly, we reduce the award for pain and suffering to Mrs. Dufrene to $17,500, affirming at the same time the award to her of medical expenses in the amount of $1,657.40, including interest on both amounts from date of judicial demand until paid.
For the foregoing reasons the judgment of the lower court is amended and affirmed, costs to be borne by appellants.
Amended and affirmed.
NOTES
[1] This conclusion is substantiated by the fact that, though Mrs. Dufrene testified she was still under Dr. McHardy's treatment, we have no medical reports for the 2½ year period prior to trial.