No. 47,907

Kathleen J. Simpson, *Appellant,* v. Ronald R. Davis, D. D. S., *Appellee.*

(549 P. 2d 950)

Opinion filed May 8, 1976.

*John C. Frank,* of Wichita, argued the cause, and *Raymond W. Baker,* of Wichita, was with him on the brief for the appellant.

*Ronald D. Heck,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Schroeder, J.: This is an appeal in a dental malpractice case

brought by Kathleen J. Simpson against Ronald R. Davis, D. D. S., for negligence and breach of warranty in dropping a dental reamer, approximately one inch long, in her throat which she swallowed.

The issues controlling the disposition of this appeal are: (1) Whether the trial court erred in submitting the issue of contributory negligence to the jury; and (2) whether the appellant was entitled to a directed verdict on the issue of liability.

Ronald R. Davis, D. D. S. (defendant-appellee) has been a Wichita dentist since 1959 when he graduated from the University of Missouri at Kansas City with a degree of doctor of dental surgery. While at dental school he took a course in endodontics, the study of the contents of the pulp of the tooth. However, Dr. Davis is not a certified specialist in endodontics.

Kathleen J. Simpson (plaintiff-appellant) is a 32-year-old female. On January 14, 1971, she went to see Dr. Davis. He took X-rays and told her she needed a lot of work to rejuvenate her teeth. She testified he told her root canal work was a specialized field and he assured her at the time that he was most capable of doing this work.

Dr. Davis began treatment by pulling several teeth and capping others. He intended to do a complete rehabilitation. On September 22, 1972, X-rays showed deep tooth decay of "lower left 6." Doctor Davis began a program to open the root canal on this tooth. Doctor Davis used nitrous oxide gas to relax the patient and raise the pain threshold and then used xylocaine to numb the area he was going to work on.

On October 24, 1972, the appellant, after over eighteen months of dental work with Dr. Davis off and on, went to the doctor's office complaining of a toothache. He drilled the tooth (lower left 6) out and entry was made into the pulp chamber of the tooth to get relief from the pressure and pus building up underneath the tooth. The doctor testified he was trying to get rid of the infection causing the pressure and wanted to leave the tooth alone for as many days as it takes to get comfortable before finishing treatment.

On October 30, 1972, the appellant was again experiencing a toothache in lower left 6. The tooth had been left open from the October 24 visit except that a small piece of cotton had been left in the tooth to keep out food particles. Doctor Davis and his dental assistant administered nitrous oxide and xylocaine. The appellant testified she felt extremely uncoordinated at this time. Everything was unreal, and she was very, very relaxed. Dr. Davis

began to work on the appellant. A cotton roll holder was used to isolate the area of the tooth being worked on and to prevent saliva in that area of the tooth. No rubber dam was used. A rubber dam is a piece of rubber, usually square, which the dentist punches a hole through and then places the tooth or teeth to be worked on through the small hole. The rubber dam fits around the tooth to prevent ingress of saliva, moisture from the breath or bacteria, prevent the tongue from getting into the operative area and trap or catch any instrument dropped by the dentist.

The appellant testified the doctor drilled something. Then he reached over and got something and she could feel a little bit of pressure which she knew was a reamer. The next thing she knew she felt something in the back of her throat which made her feel like she was choking. She then felt his hand inside her mouth. She testified the doctor said, "I dropped it, I dropped it." She then testified she couldn't breathe, tried to get the mask off but her hands were uncoordinated and she could not get anything off, "and they took it off," and she sat up and said "hit me on the back." She said she was choking and the doctor hit her on the back "and it must have been going down." She could then breathe.

Doctor Davis testified as he started using the reamer with a slight rotating motion the appellant moved her head and the reamer was knocked out of his hand. He unsuccessfully tried to find the reamer with his fingers. The appellant testified she did not know whether or not she moved her head (because of the gas).

After a call by Dr. Davis for an appointment, the appellant then drove to the Wichita Clinic where she was X-rayed and it was determined the reamer was in her stomach. After three or four days the reamer poked a hole in the appellant's stomach and had to be surgically removed. While in the hospital the appellant developed a bladder infection, which the appellee blames on a catheter inserted in the bladder. The appellant testified she has continued to experience bladder difficulties and cannot eat Italian or Mexican foods now.

Jay Swartzwelter, D. D. S., testified on behalf of the appellant by deposition which was read into evidence. Doctor Swartzwelter graduated from the University of Iowa in 1964 and practiced dentistry and endodontics. He testified there is no dental school or book on endodontics in the world that teaches dentists to perform endodontic procedures without a rubber dam. It was his opinion Dr. Davis deviated from the standard of care required of him in

Wichita, Kansas, and like communities, in his care and treatment of the appellant by not using a rubber dam.

J. R. Gates, Mrs. Simpson's business partner, testified Dr. Davis's nurse said a rubber dam should have been put in the mouth, but it wasn't being used on October 30, 1972.

Doctor Davis testified in his own behalf and his testimony pertinent to the disposition of this appeal will be set forth later.

The trial commenced on April 29, 1974. At the close of all the evidence, the appellant moved for a directed verdict in her favor. The court overruled the motion on the ground that questions of fact remained for the jury to determine. On May 1, 1974, the jury returned a verdict in favor of the defendant. Appeal has been duly perfected.

Both parties rely on *Harris v. Exon,* 161 Kan. 582, 170 P. 2d 827, aff'd. on rehearing, 162 Kan. 270, 176 P. 2d 260, which holds the rules of law governing the duty and liability of dentists to their patients correspond to the rules of law applicable to physicians and surgeons generally. (See also, 61 Am. Jur. 2d, Physicians, Surgeons, Etc., § 117, pp. 240-242; 70 C. J. S., Physicians and Surgeons, §§ 1 and 41, pp. 805-806, 946-947; and Annot., 83 A. L. R. 2d 7, 23 [1962].)

The record discloses the trial court had some difficulty in coming to a decision on the standard of care to be applied in giving an instruction to the jury. The trial court noted that "a general practitioner ordinarily doesn't have the skill and knowledge of a specialist." The trial court ultimately concluded, and correctly, by instructing the jury that the defendant in this case held himself out to the public as a general practitioner in dentistry and as such had the duty to use reasonable care and skill for the safety and well-being of the plaintiff. However, when the defendant undertook to perform the work of a specialist he had the duty to use the skill and care of a specialist. (*Chubb v. Holmes,* 111 Conn. 482, 150 Atl. 516 [1930].)

It is the generally accepted rule that a physician or surgeon or dentist who holds himself out to be a specialist is bound to bring to the discharge of his professional duties as a specialist that degree of skill, care and learning ordinarily possessed by specialists of a similar class, having regard to the existing state of knowledge in medicine, surgery and dentistry, that is, a higher degree of skill, care and learning than that of the average practitioner. (*Rule v. Cheeseman, Executrix,* 181 Kan. 957, 965, 317 P. 2d 472; 61 Am. Jur.

2d, Physicians, Surgeons, Etc., § 119, p. 244; 70 C. J. S., Physicians and Surgeons, § 41, p. 949; and W. Morris, *Dental Litigation*, 76 W. Va. L. Rev. 153, 153-154 [1974].)

Thus, in the trial court the appellant was required to prove: (1) That the dentist who undertook to do endodontic procedures, such as tooth root canal work, failed to perform his duties as a specialist in endodontics, and (2) that her injuries were the direct and proximate cause of such failure. (*Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093, reh. denied, 187 Kan. 186, 354 P. 2d 670; and *Noel v. Proud*, 189 Kan. 6, 367 P. 2d 61.)

We first examine the appellant's contention that because she was anesthetized, she could not have been contributorily negligent and the trial court erred in submitting the question of contributory negligence to the jury. After a careful review of the record, the point is well taken.

In *Guerra v. Jaeger*, 204 Kan. 309, 461 P. 2d 737, this court defined contributory negligence as:

". . . [C]onduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is the legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm. It is conduct which falls short of the standard to which a reasonable man should conform in order to protect himself from harm." (Syl. ¶ 3.)

Normally contributory negligence is an issue to be determined by the jury and it is only when it can be said that reasonable men could reach but one conclusion from the same evidence that the issue may be decided as a question of law. (*Mid-Century Ins. Co. v. Latimer*, 211 Kan. 810, 508 P. 2d 935.) Here reasonable men could reach but one conclusion after considering Mrs. Simpson's anesthetized state. She testified she received gas for a longer period than usual. She further received xylocaine to kill the pain. Although her mind was functioning, everything seemed unreal to her. She could not believe her feet were attached to her body.

Cheryl Carr, Dr. Davis's chair-side assistant when the incident in question occurred, testified for the appellee on direct examination:

". . . I took an x-ray that day and I gave her nitrous oxide. I administered it about 20 to 25 minutes. It was probably longer than I had administered on other occasions. I didn't notice anything unusual about the way Kathy Simpson was acting. . . ."

On cross-examination Cheryl Carr testified:

"It's normal practice after a person has had nitrous oxide that you take off the nitrous oxide and continue to use oxygen for a period of five minutes, to

get rid of all the nitrous out of their system. I didn't do that on that occasion. I suppose one might feel, after taking the gas, a drunkenness effect. Another assistant and I have tried it after hours. We have gotten a drunken effect out of it. One would become incoherent at times depending on the amount that you took. If a person takes enough nitrous oxide, they can pass completely out. . . ."

In *Voss v. Bridwell,* 188 Kan. 643, 663, 364 P. 2d 955, the court held the plaintiff could not have been contributorily negligent because he was under the influence of anesthetics and unconscious. Although Mrs. Simpson was not unconscious, her anesthetized state was sufficient to bring her within the rule announced in *Voss v. Bridwell,* supra. Under circumstances here presented we think the trial court erred in submitting the issue of contributory negligence to the jury. (See, *McGehee v. Schiffman,* 4 Cal. App. 50, 87 Pac. 290 [1906].)

The appellant contends it was error for the trial court to overrule her motion for a directed verdict on the issue of negligence on the part of the defendant—that the defendant's admissions of negligence are binding upon him.

In ruling on a motion for a directed verdict pursuant to K. S. A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. (*Tos v. Handle,* 209 Kan. 139, 495 P. 2d 896; and *Fox v. Massey-Ferguson, Inc.,* 206 Kan. 97, 476 P. 2d 646.) The same basic rule governs appellate review of a motion for a directed verdict. (*Apperson v. Security State Bank,* 215 Kan. 724, 732-733, 528 P. 2d 1211; and *Bendure v. Great Lakes Pipe Line Co.,* 199 Kan. 696, 433 P. 2d 558.)

In support of her argument the appellant cites our holding in *Hallett v. Stone,* 216 Kan. 568, 534 P. 2d 232, that:

". . . [A]dmissions made by a party are the strongest kind of evidence. . . . [A]dmissions made by a party in his testimony while a witness in the case, . . . are binding and conclusive upon him if uncontradicted or unexplained, whether such admissions are elicited on direct examination or on cross-examination of the party. . . ." (p. 575.)

Regarding his qualifications the appellee testified:

". . . I am a dentist. I went to the University of Missouri at Kansas City, and graduated in 1959. I graduated with a degree of doctor dental surgery. *I took a course in endodontics at school.* . . . I have practiced general dentistry in Wichita since 1959. *There is a classification of a specialty in endodontics, and there are endodontists in Wichita. Limit their practice to*

endodontics. *To become board qualified you take a two-year training program or a number of post graduate programs satisfying the requirements of the American Board of Endodontists.* Also submitting a number of satisfactorily completed cases. I have not attempted to become board qualified for endodontics. *I have taken post-graduate courses in dentistry. . . .*" (Emphasis added.)

Further, on direct examination the following narrative testimony of the appellee is set forth in the record:

". . . Plaintiff returned to my office on October 24th. I again did an x-ray on the lower 6. She had a toothache. She had swelling in the gum tissue and the area of the tooth was tender. The tooth was opened to drain, and started removing the part we had filled up with IRM from the previous visit. This was drilled out and an entry is made into the pulp chamber. I knew we had an abscessed tooth from the examination and x-ray and to give the patient relief, that was building up underneath the tooth. We entered into the pulp chamber, pus came out of the chamber. We were trying to get rid of the source of infection and we wanted to leave the tooth alone for as many days as it takes to get it comfortable, and then we would finish treatment of the tooth. I used nitrous oxide and xylocaine on that visit. On October 30th we saw her again. It was after lunch. She was experiencing pain and had called for an appointment. I examined it and found a mobile tooth. We had swelling next to the tooth the same as before. It was a little larger area and tender. I used nitrous oxide and xylocaine. I did not x-ray the tooth. I opened the tooth to drain. The tooth had been left open from the 24th of October. The only thing that's left in the tooth is a small piece of cotton that is used to keep out the pieces of food from going down in there and blocking it up. We first irrigate it with water and then blow it out with a little air to check its present condition. I used a large round burr to grossly clean out the things again. Then we go in with what we call an explorer. The explorer would not go down deep in the tooth. I put something else in the mouth of Kathy Simpson, which was a root canal reamer, similar to defendant's Exhibit '3'. From the time she walked in the operatory until the procedure was done was probably a matter of 35 minutes. . . . As we started using a reamer with a slight rotating motion, she moved her head and the reamer was knocked out of my hand. I started to try to find the reamer around the tongue. I had my hand in her mouth. I could not find the reamer, with my fingers. Then I took the vacuum, it works like a vacuum cleaner, which was a small opening and you use it to aspirate the contents of the mouth. We ran this around in the back area there, and I shouldn't say we—I did and there was no reamer. The reamer was gone and Kathy was making an effort to get the face mask off. We helped her with that, and she was doing some choking, coughing, kind of gagging. The face mask was removed. I placed her head lower than her feet to get the head down and the feet higher than her head. She was in the dental chair. I went and called the Wichita Clinic. I called Dr. Al Hall. It took a few minutes to get the arrangements made to send her to the Clinic. I observed her before she left the office. She didn't appear to be disoriented. She had a little bit of gagging. She wanted me to pat her on the back, which I did a few times.

She left the office and went to the Wichita Clinic. *During the various procedures that were performed on Kathleen Simpson on October 30th I did not use a rubber dam.* I had a cotton roll holder in her mouth, a small one. This isolates the area so that I can see better. There is less saliva in the area. . . . In my opinion I did not depart from the standard, approved dental practice in this community or in any other community by not using the rubber dam during the procedure I used on October 30, 1972." (Emphasis added.)

On cross-examination the appellee testified:

"I did say that the procedure I used was to relieve pain. I did go down into the root canal with a root canal reamer, and that was my purpose. . . .

\* \* \* \* \*

". . . *There are two reasons primarily for the use of a rubber dam.* The first is that you can keep a tooth dry, free from saliva and sterile. *The second reason is that there are fillings, bits of tooth or instruments that are dropped, it would be impossible to go down the patient's throat.* . . . Only occasionally does it take a few seconds to put in a rubber dam. Usually a minute or a minute and a half. *I chose not to use a rubber dam in this instance. When I used the reamer, started using the reamer, I knew that I was going inside Mrs. Simpson's mouth with the reamer. Everytime we went into the mouth there is a possibility of it being dropped. I knew this. I knew when I went in there I would take my chances that it's going to be dropped either by me or by her moving her head.*

"Q. *It's foreseeable that a patient in a dental chair might move their head, isn't it?*

"A. *That's always a possibility, yes.*

"Q. Mrs. Simpson was a good patient?

"A. With nitrous oxide and xylocaine, she was as cooperative as I could have asked for. I had no—she wasn't a problem once she was anesthetized at all.

"Q. All right. She's what you would call a good patient. You didn't have any trouble with her, did you?

"A. We were very good friends.

"Q. Doctor, I think you would agree with me or at least you testified in your deposition, it would not be good dental practice to drop a reamer in a patient's throat?

"A. *A reamer or anything else.*" (Emphasis added.)

Here Dr. Davis's admission that he knew he was taking his chances was not contradicted or challenged by his later testimony. He admitted a rubber dam, a device available and designed for use to prevent the reamer from going down the patient's throat, was not used. No explanation for dropping the reamer and allowing it to go down the patient's throat detracts from the binding effect and conclusiveness of Dr. Davis's admissions. (*Hiniger v. Judy,* 194 Kan. 155, 166, 398 P. 2d 305.) Where admissions are made, far less revealing than the one made by Dr. Davis, a directed verdict is

often entered, even in opposition to the jury award. (See, *Hiniger v. Judy*, supra; and *Reeder v. Guaranteed Foods, Inc.*, 194 Kan. 386, 399 P. 2d 822.)

Three cases have involved similar factual situations in which root canal reamers were swallowed by dental patients or got into the patient's bronchus. (*Lipman v. Lustig*, 346 Mass. 182, 190 N. E. 2d 675 [1963]; *Cohen v. Weber*, 36 N. Y. App. Div. 2d 921, 320 N. Y. S. 2d 759 [1971]; and *DuFrene v. Faget*, 260 So. 2d 76 [La. App. 1972], writ denied, 262 So. 2d 35 [La. 1972].)

Although the legal issues involved in these cases are different, they illustrate swallowing a dental reamer is not an uncommon occurrence. None of these cases involved admissions by a general dental practitioner, who knew by employing the use of a rubber dam it would be impossible for an instrument to go down the patient's throat, but who chose by not using a rubber dam to take his chances that a dental reamer would be dropped.

Accordingly, the trial court erred in failing to direct a verdict for the plaintiff on the issue of the defendant's negligence. However, our opinion should not be construed as resolving factual issues concerning damages due the plaintiff; if any.

Other points asserted on appeal need not be examined in the light of our decision.

The judgment of the lower court is reversed and the case is remanded with directions to proceed to trial on the issue of damages.

KAUL, J. (dissenting in part): I cannot agree with the court's holding that the trial court erred in overruling plaintiff's motion for a directed verdict on the issue of negligence, therefore I must respectfully dissent from paragraph 5(*b*) of the syllabus and the corresponding portions of the opinion. In effect, the majority holding is that the dropping of a dental reamer by defendant in plaintiff's mouth, while performing a root canal procedure, constituted negligence as a matter of law. This conclusion is largely based upon what is said to be an admission of defendant and application of the well-established principle that admissions made by a party in his testimony are the strongest kind of evidence and conclusive upon him if uncontradicted or unexplained. I agree with the proposition as an abstract principle of law, but in my opinion it has been misapplied in the instant case.

As pointed out in the majority opinion, the testimony of Dr. Davis, relied upon as an admission, came in the form of a response to a question put to him by plaintiff's counsel on cross-examination.

The question framed by plaintiff's counsel and the response thereto is reproduced in the record as follows:

"Q. Doctor, I think you would agree with me or at least you testified in your deposition, it would not be good dental practice to drop a reamer in a patient's throat?

"A. A reamer or anything else."

This is a hypothetical question framed in a fashion by plaintiff's skillful counsel which he well knew would compel an affirmative answer. It is not an admission by Dr. Davis that he dropped the reamer in plaintiff's throat, nor is there any evidence to that effect. The only direct evidence as to the precise location of the reamer, after it was dropped, is the testimony of the dental assistant who testified:

". . . I looked in the mouth myself. I saw the reamer on the back of her tongue. I watched him try for it with his fingers, and he asked me for a vacuum, and I handed it to him. . . ."

The reamer was dropped in the patient's mouth or on her tongue, and then swallowed. There is no evidence that Dr. Davis dropped the reamer down plaintiff's throat. In my opinion, the response of Dr. Davis to counsel's hypothetical question cannot be made to serve as a basis for application of the binding admissions rule so as to support a directed verdict.

Dr. Davis testified every time he entered a patient's mouth there was a possibility that an instrument might be dropped. That such is not an uncommon occurrence, particularly in a root canal procedure, is borne out by the fact that three cases involving the swallowing of dental reamers, where a rubber dam was not used, have reached appellate level courts in recent years. (*Lipman v. Lustig,* 346 Mass. 182, 190 N. E. 2d 675 [1963]; *Cohen v. Weber,* 36 N. Y. App. Div. 2d 921, 320 N. Y. S. 2d 759 [1971]; and *DuFrene v. Faget,* 260 So. 2d 76 [La. App. 1972], writ den. 262 So. 2d 35 [La. 1972.]) In none of the cases referred to is it suggested that the dropping of a reamer or the failure to employ a rubber dam in a root canal procedure constituted negligence as a matter of law.

Concerning the question whether failure to use a rubber dam was a departure from approved standards of practice in root canal procedures, Dr. Davis testified:

". . . I had a cotton roll holder in her mouth, a small one. This isolates the area so that I can see better. There is less saliva in the area. . . . In my opinion I did not depart from the standard, approved dental practice in this community or in any other community by not using the rubber dam during the procedure I used on October 30, 1972."

Dr. Swartzwelter, the plaintiff's expert, disputed defendant's testimony on this point. Resolution of the conflict was for the jury. A motion for directed verdict may be granted only when the court, after resolving all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, finds that reasonable minds could not reach different conclusions on the question at issue. In my judgment the record before us does not warrant a holding of negligence as a matter of law.

I agree with the majority that submission of contributory negligence on the record presented was erroneous and prejudicial to the extent that a new trial must be granted.

I would reverse the judgment below and direct a new trial on all issues.

OWSLEY and PRAGER, JJ., join in the foregoing dissenting opinion.