**Diana HOBBS, Plaintiff-Appellant,**

v.

**William J. TIERNEY, M.D.,
Defendant-Appellee.**

**No. 1–1185A297.**

Court of Appeals of Indiana,
First District.

July 16, 1986.
Rehearing Denied Aug. 26, 1986.

Robert E. Saint, Coons & Saint, Indianapolis, James L. Brand, Free, Brand, Tosick & Allen, Greenfield, for plaintiff-appellant.

Jon D. Krahulik, N. Kent Smith, Bingham, Summers, Welsh & Spilman, Indianapolis, for defendant-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Plaintiff-appellant, Diana Hobbs (Hobbs), appeals from an adverse judgment entered by the Hancock Circuit Court following a jury trial based on her complaint filed against William J. Tierney, M.D. (Dr. Tierney) alleging medical malpractice.

We affirm.

## STATEMENT OF THE FACTS

The facts most favorable to the judgment are as follows. Dr. Tierney is a specialist in general surgery which encompasses surgical procedures throughout the abdominal cavity. He is certified by the American Board of Surgery and is a member of several professional organizations. His educational background and training consists of medical school, a one-year internship, and five years of Specialty Training in Surgery. In his general surgery training, Dr. Tierney was exposed to gynecological surgery which deals with diseases of women. Dr. Tierney was exposed to the area of obstetrics, which deals with the care of an expectant mother, in medical school and in his internship, but he was not extensively trained nor did he generally practice in the area of obstetrics. Both general surgeons and obstetrician-gynecologists are qualified to perform gynecological surgery after their training. In Dr. Tierney's practice in Anderson, Indiana, he was experienced in gynecological surgery.

On July 14, 1980, Hobbs was examined by her family physician, L.P. Musngi, M.D. (Dr. Musngi), who ordered a blood test to determine whether Hobbs was pregnant. The test was sent to St. John's Hospital for processing.

Later that evening Hobbs experienced pain in the lower right quadrant of her pelvic region and went to the emergency room at St. John's Hospital. In the emergency room Hobbs complained of her pain, nausea, and a missed menstrual period. Two separate urine tests to detect pregnancy were then administered, one testing positive and one testing negative. Based on her symptoms at the time, Dr. Tierney, the general surgeon on call, was summoned to the emergency room to further evaluate Hobbs' condition.

Dr. Tierney received report of Hobbs' complaints and symptoms, took her medical history, which revealed a prior pelvic inflammatory disease, and performed a physical examination which was inconclusive in diagnosing her condition. He was informed that the more accurate blood test to determine pregnancy had already been administered by Dr. Musngi and was being processed by the hospital at that time. In his admitting diagnosis, Dr. Tierney noted a possible ectopic pregnancy, a possible normal intrauterine pregnancy, and a possible recurrent pelvic inflammatory disease. Hobbs was then admitted to the hospital for further testing and observation. An intravenous antibiotic was administered to Hobbs overnight to alleviate her pain and possible pelvic inflammatory disease.

On the 15th, the following day, the blood test taken by Dr. Musngi was complete and registered positive. Dr. Tierney had ordered an ultrasound study on Hobbs in order to locate the pregnancy, but the

study revealed little diagnostic value. Meanwhile, Hobbs' painful condition for which she was admitted had rapidly improved. Although surgical and other diagnostic procedures were available to help Dr. Tierney locate the pregnancy, he decided not to use them since Hobbs' condition was improving, and they posed significant risks to Hobbs herself and the possible normal intrauterine pregnancy. Hobbs remained under supervision in the hospital until the 17th when she requested to be discharged.

Prior to being discharged, Dr. Tierney told Hobbs that she was pregnant, but that she may have an ectopic pregnancy. Dr. Tierney had seen Dr. Musngi in St. John's Hospital during the time Hobbs was there and informed him that Hobbs may have an ectopic pregnancy. Hobbs was discharged back to Dr. Musngi and told to make an appointment with him within the week for further observation. Dr. Tierney did not communicate with Dr. Musngi after Hobbs was discharged, nor did he follow up on her condition.

Hobbs went to see Dr. Musngi after she was discharged, but on August 5, she sought the services of Dr. Copeland, an obstetrician-gynecologist, to help her during her pregnancy. Later, on August 8, Hobbs presented herself to Dr. Copeland complaining of pain and some bleeding. Dr. Copeland testified that Hobbs told him that her pregnancy may be ectopic. After examination, Dr. Copeland immediately scheduled her for surgery and removed a ruptured ectopic pregnancy. Hobbs subsequently brought this suit against Dr. Tierney for medical malpractice.

## ISSUES

The following issues have been raised in this appeal:

I. Whether the court erred by refusing plaintiff's tendered Final Jury Instruction Nos. 4, 7 and 10.

II. Whether the court erred by failing to exclude certain testimony of Sprague H. Gardiner, M.D.

## DISCUSSION AND DECISION

Issue I: *Jury Instructions—Standard of Care of a Specialist.*

In Hobbs' first issue, she argues that by denying her tendered jury instructions numbered 4, 7, and 10, the jury was not instructed on the appropriate standard of care of the specialty involved. In determining whether refusing the tendered instructions was error, Hobbs correctly cites *Shull v. B.F. Goodrich Co.* (1985), Ind. App., 477 N.E.2d 924, 926, *trans. denied,* which states that we will consider: "(1) whether the tendered instruction is a correct statement of the law, (2) whether there is evidence in the record to support the giving of the instruction, and (3) whether the substance of the tendered instruction is covered by other instructions which were given." The second test is actually a sufficiency of the evidence question, *id.,* and in the case at bar, the first and second tests are interrelated. In other words, if there is sufficient evidence to support the instructions given which are otherwise a correct statement of the law, there was no error. In reviewing the sufficiency of the evidence, we review the evidence and reasonable inferences therefrom, which, when viewed in the light most favorable to the proponent, support the jury's verdict on the theory contained in the instructions. *Id.*

At trial the jury was instructed on the standard of care of a doctor as a specialist. When holding himself out as a specialist, the standard care of a physician or surgeon in Indiana which is owed to his patients is the following:

"The degree of skill and care required of the physician or surgeon who is employed because he is a specialist, is that degree of skill and knowledge which is ordinarily possessed by physicians and surgeons who devote special attention to the ailment, its diagnosis and treatment, in similar localities."

*Worster v. Caylor* (1953), 231 Ind. 625, 630, 110 N.E.2d 337, 339, *overruled on other grounds; Dolezal v. Goode* (1982), Ind. App., 433 N.E.2d 828, 831, *trans. denied;*

*Bassett v. Glock* (1977), 174 Ind.App. 439, 368 N.E.2d 18, 22; *see Adkins v. Ropp* (1937), 105 Ind.App. 331, 14 N.E.2d 727; *Baker v. Hancock* (1902), 29 Ind.App. 456, 64 N.E. 38. Reflecting this statement of the law, Dr. Tierney's Instructions Numbered 5 and 15 were given to the jury. Instruction Number 5 states:

"You are further instructed that where a physician holds himself out as having special knowledge and skill in the field of medicine, such a physician is bound to bring to the discharge of his duty to a patient employing him as such a specialist, not merely the average degree of skill possessed by general practitioners, but that special degree of skill and knowledge possessed by physicians who are specialists in the treatment of such conditions in light of the then existing state of scientific knowledge."

Instruction Number 15 states:

"A doctor who holds himself out as a specialist and who undertakes service in a special branch of medical, surgical or other healing science, owes to his patient the duty of possessing that degree of learning and skill ordinarily possessed and used by specialists in good standing, practicing in the same special field, in the same or similar locality and under like or similar circumstances."

Instruction Number 15 was essentially taken from INDIANA PATTERN JURY INSTRUCTIONS 19.75 (1966) which were prepared by the Indiana Judges' Association and have been tacitly approved by our supreme court in Ind. Rules of Procedure, Trial Rule 51(E). Therefore, the above instructions are a correct statement of the law as they pertain to the standard of care of physicians or surgeons practicing as specialists.

■ Hobbs essentially claims the above instructions are an incorrect statement of the law as applied to this case. She claims the jury should have been specifically instructed that Dr. Tierney be held to the standard of care of an obstetrician-gynecologist instead of a physician or surgeon. The basis of Hobbs' argument is that since Dr. Tierney treated her for female problems within the pelvis, including pregnancy, he undertook to treat a condition within the speciality of obstetrics-gynecology. As such, she maintains Dr. Tierney was required to exercise the same degree of skill and learning possessed by physicians who devote special attention to such conditions, i.e. obstetrician-gynecologists. Hobbs notes that the level of expertise of obstetrician-gynecologists in Anderson, Indiana, in 1980, enabled them to use various other forms of diagnostic techniques or procedures which were more accurate in detecting Hobbs' condition. Therefore, Hobbs maintains that since Dr. Tierney, who had used some of these techniques by that time but did not use them or did not at least determine in some way the source of Hobbs' pregnancy before she was discharged, he fell below the standard of care of an obstetrician-gynecologist.

In support of her argument, Hobbs relies primarily on *Joy v. Chau* (1978), 177 Ind. App. 29, 377 N.E.2d 670, *trans. denied.* In *Joy,* the plaintiff alleged that the trial court erred by giving three final instructions which referred to the "doctor" without indicating that a medical specialization was involved. The court noted, however, that an additional instruction stated that the defendant, Dr. Chau, was required to possess the degree of skill and knowledge ordinarily possessed by physicians specializing in orthopedics, and as read as a whole, the jury was properly instructed. Dr. Chau was a board certified surgeon, his practice partially consisted of orthopedics, he performed orthopedic surgery on the plaintiff, and the court held him to the standard of care of a physician specializing in orthopedics. Hobbs' logic would apparently reason that Dr. Tierney was a board certified surgeon, his practice included experience in gynecological surgery and obstetrician-gynecological techniques, in treating Hobbs he entered the field of obstetrics-gynecology, and he should have been held to the standard of care of a physician specializing in obstetrics-gynecology. Hobbs' argument suffers from semantics and inherent errors in the use of abstractions in logical reasoning. Abstract

classifications within the various recognized fields of medicine do not have concrete boundaries.

The fallacy within Hobbs' argument is that she maintains that whenever a specialist performs a function which could be categorized within a different area of specialization, he will be held to the degree of care of that different specialization, regardless of whether the function is properly within the doctor's own area of expertise. This distinction was aptly described in *Gaston v. Hunter* (1978), 121 Ariz. 33, 54–55, 588 P.2d 326, 347–48:

> "Plaintiff further argues, based upon the testimony of Dr. Johnston, that the defendants actually invaded the field of neurosurgery, and should be held to the standards of medical care applicable in that field. Concededly, when the defendant undertakes to perform the work of a specialist, he will be held to the standard of care applicable to that specialty. *See Simpson v. Davis*, 219 Kan. 584, 549 P.2d 950 (1976). However, the evidence does not show that in performing the technique of chemonucleolysis the defendants had abandoned the field of orthopedic surgery. The mere fact that two specialties may treat the same symptoms or perform the same operations does not imply that a physician's conduct will no longer be tested by the standards of his own school or of his own specialty. *See Rickett v. Hayes*, 256 Ark. 893, 511 S.W.2d 187 (1974). *See also Sutton v. Cook*, [254 Or. 116, 458 P.2d 402 (1969).]"

Other cases cited by Hobbs state either that a general physician who undertakes to perform the work of a specialist will be held to the higher standard of care, or that a physician who performs within the specialization he holds himself out to have, will be held to the standard of care of that specialization.

In *Joy*, Dr. Chau never abandoned the specialty he held himself out to have, and in the case at bar, the evidence disclosed that in treating Hobbs, Dr. Tierney also did not abandon the specialty he held himself out to have. During his five years of residency training, Dr. Tierney was exposed to surgery involving various intra-abdominal problems, including gynecological surgery. Gynecological surgery deals with diseases of women and the operative experience related to the uterus, fallopian tubes, and ovaries. There is an overlap between obstetrician-gynecology surgery and general surgery, and after training, doctors in both areas are qualified to perform gynecological surgery. Treatment of tubal pregnancy is one area of overlap between an obstetrician-gynecologist and a general surgeon. Dr. Tierney himself had operated on approximately 20–25 ectopic or tubal pregnancies prior to treating Hobbs.

It must be remembered that Dr. Tierney at all times held himself out as a general surgeon, and that Hobbs was not referred to nor was she seeking any particular specialist. Hobbs presented herself to the hospital emergency room, and shortly after overnight treatment, her emergency condition subsided. It was standard practice at St. John's Hospital in 1980 that if someone came into emergency with a stomach or abdominal complaint which required further evaluation, a general surgeon would be called. Although Dr. Tierney did not conclusively determine the location of Hobbs' pregnancy, there was evidence that it was just too early to tell, or that there may have already been a rupture which would explain why the diagnostic techniques used by Dr. Tierney were inconclusive.

As we hold that the evidence supports the instructions given, it was for the jury to decide whether Dr. Tierney did not meet his standard of care in not using other diagnostic techniques to more accurately locate Hobbs' pregnancy prior to her discharge. The other diagnostic techniques available to Dr. Tierney carried with them various other risks, among them was the risk that a normal intrauterine pregnancy, which was still possible, could be terminated.

Since the jury was instructed on the appropriate standard of care and there is

sufficient evidence in the record to support its verdict, it will not be disturbed.

Issue II: *Expert Testimony.*

In this issue, Hobbs argues that the trial court erred by failing to exclude the opinion testimony of Sprague H. Gardiner, M.D. (Dr. Gardiner) for the following reasons: (1) Dr. Gardiner gave his opinion on Dr. Tierney's performance based on the standard of care of a general surgeon instead of an obstetrician-gynecologist, and (2) Dr. Gardiner failed to state an adequate factual foundation for his opinions. Based on our resolution of Issue I, Hobbs' first argument here is without merit since Dr. Gardiner used the appropriate standard of care in rendering his opinions.

◼ Under Hobbs' second argument, she maintains the factual foundation necessary to establish Dr. Gardiner's competency, which she claims was not done, is his familiarity with the standard of care of physicians in Anderson, Indiana in 1980. Dr. Gardiner is a board certified obstetrician-gynecologist practicing in Indianapolis, Indiana. Dr. Tierney counters by arguing that the Indiana Medical Malpractice Act specifically permits opinions rendered by a member of the medical review panel to be absolutely admissible, and Dr. Gardiner's testimony consisted of an explanation of the basis of his opinion as a member of the panel.

Under the Indiana Medical Malpractice Act, members of the medical review panel may consist of any health care provider in Indiana, teacher or otherwise, who holds a license to practice in his profession. IND. CODE 16–9.5–9–3(b)(1). One of the members of the panel must be an attorney who, as chairman, acts in an advisory capacity relative to any legal question involved in the review proceeding and supervises the panel to assure that each party has a reasonable opportunity to present its evidence. *Kranda v. Houser-Norborg Medical Corp.* (1981), Ind.App., 419 N.E.2d 1024, *appeal dismissed* (1982), 459 U.S. 802, 103 S.Ct. 23, 74 L.Ed.2d 39; IND.CODE 16–9.5–9–3, 4. The purpose of the panel is to conduct a rational inquiry into the extent and the source of the patient's injuries for the purpose of forming an expert opinion. *Johnson v. St. Vincent's Hospital, Inc.* (1980), 273 Ind. 374, 404 N.E.2d 585; *Kranda, supra.* It is the panel's sole duty "to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant ... acted or failed to act within the appropriate standards of care as charged in the complaint." IND.CODE 16–9.5–9–7. The panel also has the right and duty to request all necessary information to fully inform itself regarding the issues to be decided. IND.CODE 16–9.5–9–6. In the case at bar, the panel rendered its expert opinion that the evidence did not support the conclusion that Dr. Tierney failed to meet the applicable standard of care as charged in the complaint.

The use of the panel's expert opinion in a subsequent trial is governed by IND.CODE 16–9.5–9–9:

"Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness. If called, the witness shall be required to appear and testify...."

Hobbs maintains that this does not state that Dr. Gardiner shall give his opinion without further qualification concerning Dr. Tierney and his locality and the localities with which Dr. Gardiner is familiar. However, to engraft this additional requirement onto the statute would usurp the function of its express terms. Hobbs does not contend that Dr. Gardiner testified in a manner other than reporting the expert opinion of the panel. The only error Hobbs alleges is that the opinion is based on an inappropriate standard of care which we have determined otherwise. No evidence was presented nor does the record suggest that the panel was in any way delinquent in exercising its duty to determine the appropriate standard of care and whether Dr. Tierney fell below that standard as charged

in the complaint. Furthermore, the jury was instructed that the opinion of the medical review panel is in no way conclusive, and that it was to consider the weight and credit to which the panel opinion is entitled.

For the above reasons, the judgment of the trial court is affirmed.

Judgment affirmed.

ROBERTSON, P.J., concurs.

RATLIFF, J., concurs in result with opinion.

RATLIFF, Judge, concurring in result.

Where areas of medical specialty overlap, a physician performing in such area is held to the standards of his or her specialty and not to the standard of the other specialty which also may be involved. *See, Rickett v. Hayes* (1974), 256 Ark. 893, 511 S.W.2d 187 (where defendant in malpractice action was oral surgeon, and area involved was one of overlap between oral surgeon and plastic surgeon, defendant was to be judged by the standards of his own specialty). Because there is evidence that both general surgeons and specialists in obstetrics and gynecology operated in the area involved in this case, the trial court did not err in refusing Hobbs's tendered instructions which would have held Dr. Tierney to the standards expected of a medical specialist in the field of obstetrics and gynecology. For that reason, I concur in the result in this case.

I am not convinced that the instructions numbered 5 and 15 which were given by the trial judge, while correct abstract statements of the law, accurately instructed the jury as to the standard of care required of Dr. Tierney because the jury was not informed of Dr. Tierney's specialty and that he was held to that degree of care required of a general surgeon. *See, Joy v. Chau* (1978), 177 Ind.App. 29, 377 N.E.2d 670 (court gave instructions that doctor was required to possess the degree of skill and knowledge ordinarily possessed by orthopedic surgeons). However, no objection to these instructions was made on that

ground. No issue as to the adequacy of these instructions is before us, however.

Therefore, I concur in result.